MAINE SUPREME JUDICIAL COURT                     Reporter of Decisions
Decision:       2022 ME 54
Docket:         Aro-21-366
Argued          July 6, 2022
Decided:        November 8, 2022

Panel:          STANFILL, C.J., and MEAD, JABAR, HORTON, CONNORS, and LAWRENCE, JJ.

## STATE OF MAINE

v.

## JOMO WHITE

CONNORS, J.

[¶1]  Jomo White appeals from a judgment of conviction of various offenses, including attempted murder (Class A), 17-A M.R.S. § 152(1)(A) (2022), entered by the trial court (Aroostook County, *Nelson, J.*).[1]  White's principal argument is that the trial court erred in denying his repeated motions for a mistrial based on allegedly improper comments made in the State's

---

[1]  White was also convicted of elevated aggravated assault (Class A), 17-A M.R.S. § 208-B(1)(A), (2) (2022); robbery (Class A), 17-A M.R.S. § 651(1)(D) (2022); reckless conduct with a dangerous weapon (Class C), 17-A M.R.S. § 211(1) (2022); and illegal possession of a firearm by a prohibited person (Class C), 15 M.R.S. § 393(1)(A-1) (2018).

According to the complaint, the charge of reckless conduct with a dangerous weapon was elevated to Class C under 17-A M.R.S. § 1252(4) (2018) because White used a dangerous weapon.  Section 1252, however, was repealed and replaced approximately four months before the State charged White.  *See* P.L. 2019, ch. 113, §§ A-1 to -2 (emergency, effective May 16, 2019) (codified at 17-A M.R.S. § 1604(5)(A) (2022)).  This error does not affect the present appeal.  *See State v. Dyer*, 371 A.2d 1086, 1088-89 (Me. 1977) (stating that the mislabeling of a statute in the caption did not render an indictment defective).  The statute defining illegal possession of a firearm by a prohibited person was amended in 2021, though not in any way that affects the present case.  *See* P.L. 2021, ch. 608, §§ B-1 to -3 (effective Aug. 8, 2022) (codified at 15 M.R.S. § 393(1)(A-1) (2022)).

opening statement, closing argument, and rebuttal. We agree that multiple acts of prosecutorial error occurred. Under the Maine Constitution, Me. Const. art. I, §§ 6, 6-A, and our supervisory power, we vacate the judgment and remand for a new trial.

## I. BACKGROUND

### A. Factual Background

[¶2] Viewing the evidence admitted at trial in the light most favorable to the State, the fact finder could rationally have found the following facts beyond a reasonable doubt. *See State v. Athayde*, 2022 ME 41, ¶ 2, 277 A.3d 387.

[¶3] Both White and the victim were involved in drug trafficking. In the early hours of September 9, 2019, White and at least one other individual went to a house in the Micmac housing area in Presque Isle. The victim was staying in the basement of the house where several of his associates resided. White and the victim had recently had a dispute about proceeds from drug sales, and White went to the house to take money and drugs from the victim.

[¶4] White, who had previously been convicted of a felony, was wearing a white Halloween mask and was armed with a handgun. He entered the house and went down the stairs leading to the basement where the victim was located. The victim was wearing body armor and had a handgun nearby. Upon seeing

White masked and armed, the victim retrieved his handgun and shot at White. White then headed back up the stairs while shooting at the victim, who was now chasing him. Several other individuals were present in the basement during the shootout. White shot the victim at least once in the arm and twice in the torso before exiting the house. After White left, the victim called 9-1-1, and first responders arrived. Although the victim's injuries were life-threatening, he survived the shooting.

[¶5] White subsequently discarded his mask and handgun and cut his hair and beard. After he was arrested the following day, while being transported to the police station, he stated that he had acted in self-defense but also that he had "shot to kill." Later that day, White was interviewed by a detective and made multiple statements about the shootout, including that he acted in self-defense and that he had wanted only to speak with the victim.

## B. Procedural History

[¶6] On September 11, 2019, White was charged by complaint. He was then indicted by a grand jury and pleaded not guilty to all counts.

4

### 1. Venue and Venire

[¶7]  Prior to trial, White, who describes himself as a Black man, moved for a change of venue based on pretrial publicity and a claim that the jury venire did not represent a fair cross-section of the community.  The trial court denied the motion.[2]

### 2. The Prosecutorial Comments at Issue

[¶8]  White proceeded to a jury trial on four of the five counts in the indictment and elected to waive his right to a jury trial on the charge of illegal possession of a firearm by a prohibited person.  The trial court held a seven-day jury trial from July 27, 2021, to August 5, 2021.

[¶9]  Over the course of the trial, White objected to aspects of the State's opening statement, closing argument, and rebuttal.  First, during the opening, White objected on the ground that the opening was argumentative, which objection the trial court overruled.  Second, White moved for a mistrial at the end of the State's opening after the prosecutor asked the jury "to hold the defendant accountable for his criminal actions and to find him guilty." Although the trial court concluded that the comment was improper, it determined that

---

[2]  Before us, White frames this argument as focusing primarily on venue, although he incorporates within that argument a grievance about his inability to obtain a venire in Aroostook County that represents a fair cross-section of the community.

the issue could be remedied with a curative instruction, which the court provided immediately thereafter.

[¶10]  The third and fourth comments to which White objected were made during the State's closing.  During the trial, a detective testified that he recorded an interview he had with White in which White made statements about the shootout.  The audio recording was played and entered into evidence. White did not testify at the trial.  In his closing, alluding to the statements made by White during his interview with the detective, the prosecutor stated: "It's hard to assess the testimony of an audio recording separately from the witnesses who are on the stand and you're able to look at them and see them and make certain assessments."  Thereafter, the prosecutor "urg[ed]" the jury to find White guilty.

[¶11]  White renewed his motion for a mistrial based on these two statements, contending that the prosecutor improperly referenced his decision not to testify and that the prosecutor had again improperly implied that the jury had a duty to find him guilty.  The trial court found that the statement referencing the audio recording was improper because it "illuminated the fact that the defendant didn't take the stand."  The court concluded, however, that a curative instruction could rectify the problem and denied White's motion for a

6

mistrial on that basis. It provided the jury with an instruction before continuing with closing arguments. The trial court concluded that the "urging" statement was not improper.

[¶12] Finally, the prosecutor ended his rebuttal by once again urging the jury to "find the defendant guilty." White renewed his request for a mistrial, which the trial court again denied.

### 3.   Conviction

[¶13]   The jury found White guilty of attempted murder, elevated aggravated assault, robbery, and reckless conduct with a dangerous weapon. The trial court also found that the State proved beyond a reasonable doubt that White had illegally possessed a firearm.[3] Judgment was entered, and White was sentenced to twenty-six years' imprisonment for attempted murder, with all but sixteen years suspended.[4] White timely appeals.[5] *See* 15 M.R.S. § 2115 (2022); M.R. App. P. 2B(b)(1).

---

[3] White stipulated that he had a prior felony conviction.

[4] White was also sentenced to fifteen years' imprisonment for elevated aggravated assault; sixteen years' imprisonment for robbery; five years' imprisonment for reckless conduct with a dangerous weapon; and five years' imprisonment for illegal possession of a firearm, all to be served concurrently. He was also ordered to serve four years' probation. White applied for leave to appeal his sentence, but the Sentence Review Panel denied the application. *See* 15 M.R.S. §§ 2151-2152 (2022); M.R. App. P. 20(a)(1), (f).

[5] Before sentencing, White moved for a new trial on the ground that, according to an independent third party, the jury had erroneously assigned great weight to White's failure to testify. The trial court denied the motion. White alludes to this contention in his brief, but it is unclear whether he references it to support his argument that the trial court abused its discretion in denying his

## II. DISCUSSION

**A.** **White's contentions that the trial court erred or abused its discretion in denying his motion to change venue because of pretrial publicity and the makeup of the jury venire fail as stand-alone arguments.**

[¶14] We review the trial court's denial of a motion to change venue for an abuse of discretion. *State v. Saucier*, 2001 ME 107, ¶ 14, 776 A.2d 621.

[¶15] To prevail on a motion to change venue based on pretrial publicity, the movant must show prejudice absent the change. *See id.* White does not contend, and did not contend below, that his motion should have been granted due to actual prejudice. Prejudice is presumed only when the defendant demonstrates that "pretrial publicity has the immediacy, the intensity, or the invidiousness sufficient to arouse general ill will and vindictiveness against the accused at the time of jury selection." *Id.* ¶ 15 (quotation marks omitted). White did not introduce any evidence of pretrial publicity, let alone publicity

on-the-record requests for a mistrial or if White is also separately arguing that the trial court abused its discretion in denying his post-trial motion for a new trial. In any event, White did not provide any evidence to the trial court but merely asserted that he heard it from a "party familiar with one of the jurors," and we give the unsupported contention no weight. *See Ma v. Bryan*, 2010 ME 55, ¶ 10, 997 A.2d 755; *see also State v. Chesnel*, 1999 ME 120, ¶ 26, 734 A.2d 1131 ("Certainly, we could not vacate a conviction solely upon a defeated litigant's affidavit as to what he claims jurors may have said. We have no basis to determine the veracity of such statements or the circumstances in which they were made.").

8

that was so immediate, intense, or invidious as to justify a presumption of prejudice.

[¶16]  With respect to White's challenge to the makeup of the venire,[6] the Sixth Amendment of the United States Constitution[7] guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a . . . trial, by an impartial jury of the State and district wherein the crime shall have been committed."  U.S. Const. amend. VI.  As part of that right, the jury venire "must be drawn from a 'fair cross section of the community,' but a 'fair cross section' does not guarantee that juries be 'of any particular composition.'"  *State v. Thomas*, 2022 ME 27, ¶ 27, 274 A.3d 356 (quoting *Taylor v. Louisiana*, 419 U.S. 522, 527, 538 (1975)).  "All that is required is that the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof."  *State v. Holland*, 2009 ME 72, ¶ 22, 976 A.2d 227 (quotation marks omitted).

---

[6]  We have not yet articulated whether our review of a trial court determination that the jury constituted a fair cross-section of the community is de novo or entails a mixed question of fact and law, with the factual component reviewed only for clear error.  *Compare State v. Griffin*, 846 N.W.2d 93, 99 (Minn. Ct. App. 2014), *with People v. Washington*, 179 P.3d 153, 158 (Colo. App. 2007).  We need not resolve this issue given that White's claim fails under either standard of review.

[7]  White has not asserted a challenge to venue or to the venire under the Maine Constitution.

[¶17]  To establish a prima facie claim that the jury selection process violates the Sixth Amendment by failing to include a fair cross-section of the community, the challenging party must show that

> (1) the group alleged to be excluded is a "distinctive" group in the community; (2) the representation of this group in jury pools from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) this underrepresentation is due to systematic exclusion of the group in the jury selection process.

*Id.* ¶ 23 (citing *Duren v. Missouri*, 439 U.S. 357, 364 (1979)).

[¶18]  Black people are a distinctive group in the community.  *Id.* ¶ 24. But the United States Constitution demands a fair cross-section of the community in which the crime occurred.  *Id.* ¶ 25.  That the population of Aroostook County is largely white is immaterial, except to the extent that there is evidence of systematic exclusion of its Black population from the jury venire, and there is no such evidence here.[8]  *See id.* ¶ 31.

---

[8]  The census data referred to by White indicates that Black people constitute 1.2% of the population in Aroostook County, a statistic of which the trial court took judicial notice.  According to White, there were no Black people in the jury venire at the end of voir dire.  The State did not disagree with this assessment but asserted that at least one juror in the pool was a person of color because she was a member of the Micmac Nation.  The trial court did not expressly state whether it agreed with White's assessment.  It did, however, note that it could not determine how many of the original three hundred people who were called for jury service were Black because data on race and ethnic background is not collected on juror questionnaires.  In *State v. Holland*, we considered a similar argument to White's, and concluded that, when applying the *Duren* test, a 0.7% disparity between the percentage of members of the distinctive group in the community and the percentage of group members on the jury venire was insufficient to show underrepresentation.  2009 ME 72, ¶ 31, 976 A.2d 227.  We further suggested that a 3% disparity would also be insufficient.  *Id.* ¶ 31 n.10.  In any

[¶19]  At oral argument, perhaps sensing the weakness of these claims as stand-alone arguments, counsel for White acknowledged that he was primarily pressing the prosecutorial error argument, discussed *infra*, and had added the pretrial publicity and venire arguments to show why, based on "the whole picture," White was entitled to a new trial.  To the extent that White is arguing that, in weighing the impact of prosecutorial error, we should be particularly sensitive to the fact that White was an out-of-state Black man who had been selling illegal drugs in a largely white community, we agree.  Context matters. *Cf. State v. Fleming*, 2020 ME 120, ¶¶ 20-22, 239 A.3d 648 (discussing the importance of uncovering implicit racial biases among potential jurors, noting the value of "developing methods to confront these biases in our justice system," and "instruct[ing] our trial courts to be proactive about addressing implicit bias"); *State v. Dolloff*, 2012 ME 130, ¶ 40, 58 A.3d 1032 ("Although the prosecutor is responsible for the unflinching and assertive efforts to prosecute those who are alleged to have committed crimes, those efforts must be tempered by a level of ethical precision that avoids overreaching and prevents the fact-finder from convicting a person on the basis of something other than

---

event, both underrepresentation and systematic exclusion must be shown by the defendant, *see id.* ¶ 23, and no evidence of systematic exclusion was presented here.

evidence presented during trial. In the context of arguments to a jury, those ethical obligations require a prosecutor to avoid inviting a jury to make its decision based on bias . . . or any other impermissible basis." (citation omitted)).

**B.    Under the unique circumstances of this case, a new trial is warranted due to prosecutorial error.[9]**

**1.    The State committed error in its opening statement and closing argument.**

[¶20]    As noted *supra* at paragraphs 9-12, White challenged four comments made by the State during its opening statement, closing argument, and rebuttal, as well as the argumentative nature of the opening.

[¶21]    Two of the prosecutor's comments, in which he urged the jury to find White guilty, were, as the trial court concluded, not error. *See Dolloff*, 2012 ME 130, ¶ 68, 58 A.3d 1032. The prosecutor expressly tied these comments to

---

[9]    We use the term "error" instead of "misconduct" because our review focuses not on the prosecutor's subjective intent but on the due process rights of the defendant. *See Lucas v. United States*, 102 A.3d 270, 278 n.12 (D.C. 2014) (explaining that in evaluating whether a prosecutor's comment constitutes error, the court employs an objective test that looks at the jury's reasonable perceptions and does "not consider the intentions of the prosecutor"); *Moore v. State*, 669 N.E.2d 733, 738 (Ind. 1996) ("[T]he propriety of a prosecutor's remark does not turn on a[n] inquiry into his or her subjective motivation."); *State v. Watson*, 484 P.3d 877, 886 (Kan. 2021) ("[T]he message the prosecutor intended to communicate is irrelevant to our analysis. Instead, we must focus on the actual message communicated to jurors."); *Smith v. State*, 787 A.2d 152, 156 n.6 (Md. 2001) (noting that "the crucial question is not the prosecutor's intent" when analyzing prosecutorial comments on a defendant's exercise of the Fifth Amendment privilege); *State v. Loughbom*, 470 P.3d 499, 506 (Wash. 2020) (stating that "we do not assess a prosecutor's subjective intent when deciding whether error occurred"). *See generally Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("Past decisions of this Court demonstrate that the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor."). The trial court here found that the prosecutor acted "short of bad faith" in making the comment about White's silence.

the weight of the evidence and did not accompany his exhortations to convict with references to doing justice or fulfilling a civic duty. *See id.*; *State v. Begin*, 2015 ME 86, ¶ 27, 120 A.3d 97.

[¶22]  White's arguments as to the remainder of the comments to which he objected, however, bear discussion, as discussed *infra*.

> **a.    The prosecutor's "accountability" comment made during his opening statement, exacerbated by the argumentative nature of the statement, was erroneous.**

[¶23]  In the State's opening statement, the prosecutor improperly asked the jury "to hold the defendant accountable for his *criminal actions*."  (Emphasis added.)   The prosecutor's allusion to "criminal actions" could have been understood by the jury to refer to White's drug dealing activities, rather than just the incident upon which the offenses charged were based, which, notably, did not include a single drug charge.  In addition, as the trial court noted, "asking the jury to hold the defendant accountable instantly raises an issue."

[¶24]  In *State v. Begin*, we specifically concluded that error occurred when the prosecutor requested that the jury hold the defendant "accountable" for violating a protective order and for his other actions.  2015 ME 86, ¶¶ 6, 27-28, 120 A.3d 97 ("Here, the State's exhortation that the jury hold Begin 'accountable' improperly suggested to the jury that it had a civic duty to convict

or that it should consider the broader societal implications of its verdict, and thereby detracted from the jury's actual duty of impartiality."); *see also State v. Nobles*, 2018 ME 26, ¶¶ 13, 28, 179 A.3d 910 (concluding that there was no obvious error when the prosecutor made a comment about determining the defendant's accountability because the context showed that the prosecutor indicated only that it was the jury's job to determine whether the defendant should be held accountable, not that the jury had an obligation to hold him accountable).  Here, the prosecutor's use of the word "accountable," which was essentially identical to the comment made in *Begin*, improperly suggested to the jury that it had a civic duty to convict White, as opposed to simply urging the jury to reach that conclusion based on the evidence presented for the offenses charged.[10]

[¶25]  This error was exacerbated by the argumentative nature of the opening statement.  An opening is not supposed to be argument but rather a statement of what the evidence will show.  *See United States v. Dinitz*, 424 U.S. 600, 612 (1976) (Burger, C.J., concurring) (noting that an opening statement is "not an occasion for argument" and that its purpose is "to state what evidence

---

[10]  At oral argument, the State contended that the statement was "wholly within" the range of permissible comments as defined by *State v. Nobles*, 2018 ME 26, 179 A.3d 910.  The decision in *Nobles* is distinguishable, as noted above.  It was also a close case, decided largely on the obvious error standard.  *See id.* ¶¶ 21, 28.

will be presented, to make it easier for the jurors to understand what is to follow, and to relate parts of the evidence and testimony"); *United States v. DeVincent*, 632 F.2d 147, 153 (1st Cir. 1980) (explaining that the function of a prosecutor's opening is "limited to a discussion of the evidence which he intends to introduce and believes in good faith is admissible and available" and that it "is not to poison the jury's mind against the defendant" (quotation marks omitted)).

[¶26] Here, after reviewing the evidence to be presented, the prosecutor asked a series of rhetorical questions. Both in his evidentiary review and thereafter, he made many allusions to drugs, even though he should have been focusing the jury's attention on the offenses charged and not the defendant's status as a drug dealer. *See* ABA Criminal Justice Standards for the Prosecution Function § 3-6.8(c) (4th ed. 2017) ("The prosecutor should make only those arguments that are consistent with the trier's duty to decide the case on the evidence, and should not seek to divert the trier from that duty."). The prosecutor's exhortation to the jury to hold White accountable for his criminal actions in general improperly suggested to the jury that its verdict could be based upon White's illicit drug dealing activities in addition to the events of September 9, 2019.

### b. The prosecutor's reference during closing argument to White's silence was erroneous.

[¶27] The State also committed error in its closing when the prosecutor emphasized, when discussing White's recorded statement, the benefit of seeing and hearing live testimony. Both the Fifth Amendment to the United States Constitution and article I, section 6 of the Maine Constitution provide a criminal defendant with the absolute right not to testify in his own defense at trial. *State v. Tarbox*, 2017 ME 71, ¶ 10, 158 A.3d 957. To safeguard this right, prosecutors are prohibited from commenting on a defendant's silence or his decision not to testify. *Id.* Even ambiguous and indirect references to the defendant's silence are improper. *See id.* ¶¶ 11-12.

[¶28] Here, the plain implication of the prosecutor's statement was that it was unfortunate that the jury did not get to see and hear White testify, and, as such, the statement was an improper comment on White's silence. *See id.* ¶ 11 (concluding that the prosecutor made an improper comment by indirectly referencing the defendant's silence when noting that only the defendant and the victim were present during the alleged commission of the crimes and that the victim's testimony was "credible"); *State v. Tibbetts*, 299 A.2d 883, 886-87, 890-91 (Me. 1973) (concluding that the county attorney's comment that the

defendant "know[s] more about [the alleged crime] than anyone else" constituted an ambiguous reference to the defendant's failure to testify).[11]

### 2. Under article I, sections 6 and 6-A of the Maine Constitution and our supervisory power, the appropriate remedy in this case is a new trial.

[¶29] The evidence presented against White at trial was considerable and fully supported the jury's verdict. Armed and wearing a Halloween mask, White went to the house where the victim was staying and joined the victim in an exchange of gunfire that ended with White seriously wounding the victim. White's two primary defenses, that he did not have the requisite intent to kill the victim and that he acted in self-defense, were severely challenged by the evidence. The evidence shows that White shot at the victim multiple times and he admitted that he "shot to kill." It is axiomatic that "[a] person is never justified in using deadly force if he provokes the encounter leading to use of deadly force or if he knows that he can retreat from the encounter with complete safety." Alexander, *Maine Jury Instruction Manual* § 6-61 at 6-134 (2022 ed. 2021); *see* 17-A M.R.S. § 108(2)(C) (2022). Having provoked a gun

---

[11] The State acknowledged at oral argument that its phrasing of this comment was "inartful[]" but contended that we could view the statement as "neutral" because it was intended to provide an additional tool for the jury to use in its evaluation of the audio recording. We disagree. Regardless of what the statement was intended to mean, *see supra* n.9, even an ambiguous comment is improper if, objectively, the jury could have construed the comment as remarking on the defendant's failure to testify. *See State v. Lyons*, 1998 ME 225, ¶ 8, 718 A.2d 1102. That standard is easily met in this case.

battle, White decided to exit the basement but continued to shoot at his victim as he withdrew up the stairs, wounding his victim multiple times.

[¶30]  On appeal, even if a claim is preserved and an error was committed, that error does not warrant relief unless it "affect[s] substantial rights."[12]  Thus, the question presented here is under what circumstances erroneous prosecutorial comments at trial affect substantial rights despite abundant evidence against the defendant.

> **a.  Under the federal test, improper prosecutorial comments are not presumed prejudicial; the federal court does not apply its supervisory power outside the consideration of harmless error; and the determination of harmless error is largely based on the strength of the evidence at trial.**

[¶31]  Under our primacy approach, when an appellant raises a claim under both the Maine Constitution and the United States Constitution, we ordinarily address the claim under the Maine Constitution first.  *Athayde*, 2022 ME 41, ¶¶ 20-21, 277 A.3d 387.  If the state constitutional provision provides the relief sought by the defendant, then there is no federal violation. *Id.* ¶ 21.[13]  We follow this order here, basing our ruling today on the Maine

---

[12]  "**Harmless Error.**  Any error, defect, irregularity, or variance that does not affect substantial rights shall be disregarded."  M.R.U. Crim. P. 52(a).

[13]  White's invocation of the Maine Constitution based on the prosecutor's comments was minimal at best, with neither an express reference nor a developed argument focused on article I, sections 6 and 6-A of the Maine Constitution.  Absent such identification and development, we ordinarily would

18

Constitution, our supervisory power, and Maine common law. We begin with a discussion of federal case law only to orient the reader, and we thereafter cite federal precedent only to the extent we find it persuasive.

[¶32] By statute and rule, federal appellate courts vacate judgments only if the error at trial affects a party's substantial rights, i.e., the error at trial was not harmless. 28 U.S.C.S. § 2111 (LEXIS through Pub. L. No. 117-214); Fed. R. Crim. P. 52(a). Under both Maine and federal law, there are two types of trial errors: (1) those that are structural, in which prejudice is presumed, triggering vacatur; and (2) those that are nonstructural, triggering an analysis as to the impact of the error in that specific case. *See State v. Burdick*, 2001 ME 143, ¶¶ 27, 29, 782 A.2d 319 (citing *Arizona v. Fulminante*, 499 U.S. 279, 309-10 (1991) (differentiating between structural and nonstructural defects and stating that examples of structural errors include a total deprivation of the right to counsel at trial and the lack of an impartial judge)).

[¶33] In *Chapman v. California*, the United States Supreme Court applied a harmless error test to improper prosecutorial comments and concluded that

_____

not deem a state constitutional claim preserved. *See State v. Armstrong*, 2019 ME 117, ¶ 23 n.6, 212 A.3d 856. We nevertheless address the state constitutional claim here because White cited our decision *State v. Tarbox*, 2017 ME 71, 158 A.3d 957, which discussed the Maine Constitution, and because the question presented in this case implicates our supervisory power under state law, as discussed *infra*.

such comments do not amount to structural error. 386 U.S. 18, 23-26 (1967). Relatedly, in *United States v. Hasting*, the Court concluded that the intermediate appellate court could not rely on its supervisory power outside the framework of a harmless error analysis to require a new trial based on prosecutorial error and reversed the grant of a new trial in light of the "overwhelming evidence of guilt." 461 U.S. 499, 506-07, 509, 512 (1983); *see also Rose v. Clark*, 478 U.S. 570, 579 (1986) ("Where a reviewing court can find that the record developed at trial establishes guilt beyond a reasonable doubt, the interest in fairness has been satisfied and the judgment should be affirmed.").

> **b.** **Under article VI of the Maine Constitution and our inherent authority under Maine common law, we exercise supervisory power to ensure the integrity of the judicial process, including oversight of the conduct of attorneys.**

[¶34] In *In re Benoit*, we stated that "[w]e agree completely" with the Supreme Judicial Court of Massachusetts that "as the highest constitutional court," it is our duty under our state's constitution and the common law to "protect and preserve the integrity of the judicial system and to supervise the administration of justice," which includes "maintain[ing] and impos[ing] discipline with respect to the conduct of all members of the bar." 487 A.2d 1158, 1171 (Me. 1985) (quotation marks omitted); *see also* Me. Const. art. VI;

*State v. Grant*, 487 A.2d 627, 629 (Me. 1985) ("Where a lawyer's conduct is inimical to the integrity of the judicial system the court has the power to inquire into and, if necessary, correct the wrong done.").

[¶35]  Hence, when a trial has been infected by prosecutorial error, we are free to require a new trial based on our supervisory power regardless of the strength of the evidence against the defendant when necessary to preserve the integrity of the judicial system and to send a message that such conduct will not be tolerated.  *See State v. Pouncey*, 699 A.2d 901, 906 (Conn. 1997).  For example, in *State v. McDonald*, we vacated a judgment of conviction based on improper prosecutorial comments without discussing the strength of the evidence against the defendant, noting that the statements had "a debilitating effect on the entire judicial process, and will not be tolerated."  472 A.2d 424, 426 (Me. 1984); s*ee also State v. Robinson*, 2016 ME 24, ¶ 23, 134 A.3d 828 ("Instances of prosecutorial misconduct have a debilitating effect on the entire judicial process." (quotation marks omitted)).

        **c.**      **Under Maine law, the determination whether an error affects substantial rights is not based exclusively on an assessment of the strength of the evidence against the defendant.**

[¶36]  We have never held that the strength of the evidence against a criminal defendant is the only factor in determining whether a prosecutor's

improper comments so infected the integrity of a trial that the errors should be deemed harmless. To the contrary, unlike the United States Supreme Court, we have concluded that under the Maine Constitution, unambiguous comments on a defendant's silence are structural error. *Compare Tarbox*, 2017 ME 71, ¶ 12, 158 A.3d 957, *with Chapman*, 386 U.S. at 23-24. A trial can be rendered fundamentally unfair, impairing substantial rights, however strong the evidence. *See, e.g.*, *State v. McConkie*, 2000 ME 158, ¶¶ 2, 9-11, 755 A.2d 1075 (concluding that the admission of a confession obtained by a state actor attempting to mislead the defendant about his right to remain silent rendered the trial fundamentally unfair); *State v. Conner*, 434 A.2d 509, 514 (Me. 1981) ("*One step* in applying a harmless-error standard is to assess the strength of the state's evidence against the defendant." (emphasis added)).

[¶37] In sum, whether grounded in our supervisory power or the factors considered in determining whether substantial rights have been affected, prosecutors in Maine do not have carte blanche to engage in improper commentary whenever the evidence against the defendant is strong.

### d. A new trial is warranted under the unique circumstances of this case.

[¶38] Applying these principles of Maine law to the present case, we vacate the judgment. In 1982, focusing on our supervisory power, we stated:

> We are compelled, once again, to remind prosecutors of Justice Sutherland's oft-quoted and regrettably oft-ignored teachings in *Berger v. United States*, that while a prosecutor "may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." As a representative of an *impartial* sovereign the prosecutor's duty to ensure that a criminal defendant receives a fair trial must far outweigh any desires which may exist to achieve a successful track record of convictions.

*State v. Collin*, 441 A.2d 693, 697 (Me. 1982) (emphasis in original) (citations omitted); *see also State v. Young*, 2000 ME 144, ¶ 6, 755 A.2d 547 ("As we have noted previously, prosecutors are held to a higher standard regarding their conduct during trial because they represent the State, and because they have an obligation to ensure that justice is done, as opposed to merely ensuring that a conviction is secured." (citations omitted)).

[¶39] Since these decisions, we have repeatedly reminded prosecutors of the important responsibilities that they bear as representatives of the State of Maine and have chastised them for failing to live up to those responsibilities, including thirteen times just in the last decade.[14] Given the nature of the errors

---

[14] *See, e.g., State v. Pratt*, 2020 ME 141, ¶¶ 15-16, 243 A.3d 469; *State v. Robbins*, 2019 ME 138, ¶ 15, 215 A.3d 788; *Tarbox*, 2017 ME 71, ¶ 11 & n.1, 158 A.3d 957; *State v. Lajoie*, 2017 ME 8, ¶ 23, 154 A.3d 132; *State v. Hanscom*, 2016 ME 184, ¶¶ 18-21, 152 A.3d 632; *State v. Maderios*, 2016 ME 155, ¶ 20, 149 A.3d 1145; *State v. Robinson*, 2016 ME 24, ¶¶ 27-29, 41, 44, 134 A.3d 828; *State v. Begin*, 2015 ME 86, ¶ 27, 120 A.3d 97; *State v. Fahnley*, 2015 ME 82, ¶ 34, 119 A.3d 727; *State v. Lovejoy*, 2014 ME 48, ¶¶ 32-33, 89 A.3d 1066; *State v. Woodard*, 2013 ME 36, ¶¶ 34-35, 68 A.3d

as described *infra*, it is appropriate in this instance to take concrete action beyond verbal rebuke for two reasons.

[¶40]  First, the errors here were not isolated but framed the trial from its beginning to its closing.  *See Dolloff*, 2012 ME 130, ¶ 74, 58 A.3d 1032 (citing to article I, section 6-A of the Maine Constitution in explaining that we review serious instances of prosecutorial error cumulatively and in context).

[¶41]  Second, the nature of the errors was particularly serious.  With respect to the prosecutor's comment on White's silence, as previously noted, we consider unambiguous comments on the right against self-incrimination to be structural error.  *See Tarbox*, 2017 ME 71, ¶ 12, 158 A.3d 957.  While the prosecutor's comment here could be viewed as ambiguous, we have nevertheless been particularly sensitive to protecting this right under our Constitution.  *See State v. Lovejoy*, 2014 ME 48, ¶¶ 20-22, 27, 29, 32-33, 89 A.3d 1066 (concluding that a comment on pre-arrest silence was obvious error, particularly when considered in combination with the prosecutor's other improper comments).

---

1250; *State v. Dolloff*, 2012 ME 130, ¶¶ 51, 55-56, 58, 60, 58 A.3d 1032; *State v. Cheney*, 2012 ME 119, ¶ 35, 55 A.3d 473.

24

[¶42] With respect to the prosecutor's "accountability" comment and the argumentative nature of his opening statement, although White's pretrial publicity and venire claims fail as stand-alone arguments, he correctly points out that we cannot ignore the context: Aroostook County is overwhelmingly white, and the defendant here was an out-of-state, Black, self-acknowledged drug dealer. The prosecutor should have taken great pains to ensure that the jury focused on the elements of the offenses charged and the relevant issues relating to White's defenses. Instead, the prosecutor incessantly referenced drugs and drug dealing, diverting the jury from its legitimate task and implicitly invoking xenophobia and racial stereotyping.

[¶43] Invocations to racial bias, whether intended or not, warrant scrutiny under our supervisory power. *See State v. Santiago*, 715 A.2d 1, 19-20 (Conn. 1998).[15] Multiple courts and jurists have noted the structural

---

[15] In *State v. Santiago*, the Connecticut Supreme Court stated:

> We previously have exercised our inherent supervisory authority to safeguard against the improper consideration of race in criminal trials; and we will not hesitate to do so again if necessary. It is the jury that is a criminal defendant's fundamental protection of life and liberty against race or color prejudice. . . . Discrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice. Prejudice negates the defendant's right to be tried on the evidence in the case and not on extraneous issues. . . . More than just harm to the individual defendant is involved, however. For the introduction of racial prejudice into a trial helps further embed the already too deep impression in public consciousness that there are two standards of justice in the United States, one for whites and the other for [minorities]. Such an appearance of duality in our racially troubled times is, quite simply,

implications with respect to appeals to racial bias. *See Weddington v. State*, 545 A.2d 607, 614-15 (Del. 1988) ("[T]he right to a fair trial that is free of improper racial implications is so basic . . . that an infringement upon that right can never be treated as harmless error."); *State v. Kirk*, 339 P.3d 1213, 1218-19 (Idaho 2014) (vacating a judgment of conviction due to the risk of racial prejudice, and noting that "courts from other jurisdictions have sometimes modified or relaxed the standards for determining whether the error was prejudicial where the prosecution invoked racial considerations"); *State v. Monday*, 257 P.3d 551, 559 (Wash. 2011) (Madsen, C.J., concurring) ("I cannot agree with the majority's illusory harmless error analysis in this case. . . . Rather than engage in an unconvincing attempt to show the error here was not harmless, the court should hold instead that the prosecutor's injection of racial discrimination into this case cannot be countenanced at all, not even to the extent of contemplating to any degree that the error might be harmless."); *see also United States v. Cabrera*, 222 F.3d 590, 597 (9th Cir. 2000) (concluding that there was reversible error without a harmless error analysis and noting that "[p]eople cannot be tried on the basis of their ethnic

---

intolerable. . . . The intransigent nature of racial prejudice in our society is an unfortunate truth.

715 A.2d 1, 19-20 (Conn. 1998) (quotation marks and citations omitted).

backgrounds or national origin"); *Miller v. North Carolina*, 583 F.2d 701, 708 (4th Cir. 1978) (concluding that when a jury is exposed to "highly prejudicial argument by the prosecutor's calculated resort to racial prejudice" in a sensitive context, "the prejudice engendered is so great that automatic reversal is required"); *United States ex rel. Haynes v. McKendrick*, 481 F.2d 152, 159, 161 (2d Cir. 1973) (noting that "[i]f there is anything more antithetical to the purposes of the fourteenth amendment than the injection against a black man of race prejudice . . . we do not know what it is," and that "[r]acially prejudicial remarks are . . . so likely to prevent the jury from deciding a case in an impartial manner and so difficult, if not impossible, to correct once introduced, that a good argument for applying a more ab[s]olute standard may be made").

### III.  CONCLUSION

[¶44]  In sum, we recognize that prosecutors are advocates who should be able to argue with zeal and vigor.  *See* Robert W. Clifford, *Identifying and Preventing Improper Prosecutorial Comment in Closing Argument*, 51 Me. L. Rev. 241, 253, 263 (1999).  We understand that stray, unintended, improper comments might occur in the heat of a hard-fought trial.  Our decision to order a new trial in this instance is not based on a conclusion that the errors were intentional or that the appeal to racial bias was explicit.  But given all the

circumstances present in this instance, based on an application of article I, sections 6 and 6-A of the Maine Constitution and our supervisory power, and given that White's substantial rights were impaired, a new trial is warranted.

The entry is:

Judgment vacated. Remanded for a new trial.

---

Verne E. Paradie, Jr., Esq. (orally), Lewiston, for appellant Jomo White

Todd R. Collins, District Attorney (orally), and Kari Wells-Puckett, Dep. Dist. Atty., 8th Prosecutorial District, Caribou, for appellee State of Maine

Aroostook County Unified Criminal Docket docket number CR-2019-40866
FOR CLERK REFERENCE ONLY