MAINE SUPREME JUDICIAL COURT                      Reporter of Decisions
Decision:      2023 ME 71
Docket:        Aro-22-415
Argued:        September 14, 2023
Decided:       November 9, 2023

Panel:         STANFILL, C.J., and MEAD, JABAR, HORTON, CONNORS, LAWRENCE, and DOUGLAS, JJ.

STATE OF MAINE

v.

BOBBY L. NIGHTINGALE

HORTON, J.

[¶1]  Bobby L. Nightingale appeals from a judgment of conviction of two counts of murder, 17-A M.R.S. § 201(1)(A) (2023); a count of criminal threatening with a dangerous weapon (Class C), 17-A M.R.S. §§ 209(1), 1604(5)(A) (2023); and two counts of possession of a firearm by a prohibited person (Class C), 15 M.R.S. § 393 (1)(A-1) (2018),[1] entered by the trial court (Aroostook County, *Nelson, J.*) after a jury trial on the murder charges and a bench trial on the other charges.  Nightingale contends that the court erred by denying his request to present evidence to the jury that a State investigator had monitored telephone calls between Nightingale and his attorney while

---

[1] Title 15 M.R.S. § 393 has since been amended, though the amendments are not relevant in the present case.  *See* P.L. 2021, ch. 608, §§ B-1, B-2, B-3 (effective Aug. 8, 2022) (codified at 15 M.R.S. § 393(1)(A-1) (2023)).

Nightingale was in pretrial detention, by not granting a mistrial based on a prosecutor's improper comments made during the State's closing arguments, and by giving a jury instruction on accomplice liability when it was not generated by the evidence. Nightingale also appeals from his life sentences on the murder charges on the ground that the court failed to consider comparable sentences in its sentencing analysis. We affirm the judgment in all respects.

## I. BACKGROUND

### A. Facts

[¶2] "[T]he jury could rationally have found the following facts beyond a reasonable doubt." *State v. Athayde*, 2022 ME 41, ¶ 2, 277 A.3d 387.

[¶3] In the early morning of August 13, 2019, the Aroostook County Sheriff's Department received a 9-1-1 call from a resident of Castle Hill who reported hearing gunshots after seeing that a pickup truck had stopped along the road in front of his house. When officers responded to the 9-1-1 call, they found Roger Ellis and Allen Curtis dead inside Ellis's red pickup truck. An all-terrain vehicle (ATV), later identified as belonging to Nightingale, was wedged under the truck's front bumper.

[¶4] Ellis and Curtis had died of gunshot wounds, having been shot multiple times. All of the shots had been fired through the passenger side

window. Spent cartridge cases of two different calibers—.45 and .380—were found at the scene. Six bullets were recovered from the interior of the truck. The person who made the 9-1-1 call saw something pass in front of the truck's headlights and then saw something pass the other way and heard multiple gunshots. Another person in the area heard the noise of a loud ATV traveling fast and then heard multiple gunshots and someone shouting an expletive.

[¶5] Earlier in the night that they were killed, Ellis and Curtis had attended a party at a friend's home to celebrate Curtis's birthday. A few days before, Ellis and the friend had helped Nightingale's girlfriend move out of the home she and Nightingale had shared. While Ellis and the friend were helping the girlfriend move her belongings to Ellis's truck, Nightingale remained inside the home, extremely upset and "screaming." The girlfriend camped out in the woods behind the friend's home after leaving the home that she had shared with Nightingale. The next day, Nightingale went to the friend's home and threatened the girlfriend. The friend's husband responded by brandishing an axe handle, and Nightingale drew a firearm. After the friend threatened to call 9-1-1, Nightingale left.

[¶6] Initially, the law enforcement officers investigating the murders were unable to find Nightingale. Nightingale left a voicemail for one of the

officers indicating that he was "running" from the people who had committed the murders. When officers located Nightingale, on August 17, 2019, he tried to flee but was apprehended and placed under arrest. When he was apprehended, Nightingale was carrying a backpack containing a .380 Jimenez handgun. The gun was later subjected to ballistics testing and determined to have left the markings found on the fired .380 cartridge cases recovered from the scene of the murders. Also in the backpack was a letter Nightingale had written to his attorney that accused others of killing Ellis and Curtis. After his arrest, Nightingale told an investigator that "two Mexicans" had kidnapped him and implied that they murdered Ellis and Curtis. Nightingale had also sent text messages to acquaintances stating that another person had stolen his ATV and committed the murders. On the day after the murders, Nightingale's girlfriend texted him: "[I do not know] why you wanted to do this." He responded, "I didn't want to. I lost control of myself."

[¶7] In a search of Nightingale's residence, officers discovered a spent .45 cartridge casing that further testing indicated had been fired from the same gun that fired the .45 casings found at the murder scene. However, no .45-caliber weapon was ever found. Data from Nightingale's cell phone account revealed that around the time of the murders his phone traveled from the

vicinity of Nightingale's home in Mapleton to the vicinity of where Ellis and Curtis were found dead inside Ellis's truck.

## B.     Procedure

[¶8]  On October 10, 2019, an Aroostook County grand jury issued an eight-count indictment against Nightingale.[2]  At his arraignment, Nightingale pleaded not guilty.

[¶9]  On July 6, 2022, Nightingale filed a motion for discovery or dismissal of the State's case pursuant to Maine Rule of Unified Criminal Procedure 16(a). He asserted that while he was in jail awaiting trial, law enforcement officers had listened "to one or more phone calls between [him] and his attorneys."  He sought discovery on which calls had been monitored and disclosure of any notes or memoranda made in the course of listening to them, or dismissal of the charges against him.  The State opposed the motion, asserting that it had fully "complied with its discovery obligations."  The State's opposition included

---

[2]  The first three counts charging burglary (Class A), 17-A M.R.S. § 401(1)(B)(1) (2023); robbery (Class A), 17-A M.R.S. § 651(1)(D) (2023); and possession of a firearm by a prohibited person (Class C), 15 M.R.S. § 393 (1)(A-1) (2018); pertained to an unrelated incident in Presque Isle; they were later severed from the remaining counts and remain pending.

Nightingale waived his right to a jury trial as to Counts 4, 5, and 6.  Count 4 (criminal threatening with a dangerous weapon) and Count 5 (possession of a firearm by a prohibited person) were based on Nightingale's threatening display of a firearm at his girlfriend's friend's home on August 10, 2019. Count 6 (another charge of possession of a firearm by a prohibited person) was related to the two murders (Counts 7 and 8).  Nightingale's appeal challenges only his convictions on Counts 6, 7, and 8.

affidavits from the prosecutor and the Maine State Police investigator assigned to monitor Nightingale's telephone calls. After holding a nontestimonial hearing on the motion, the court denied it, concluding that "[p]rudent steps were promptly taken by the prosecutors to address the inadvertent disclosure" and that there was no evidence that there were notes or other documentation of any calls between Nightingale and his attorney.

[¶10] In mid-August 2022, the court held a jury trial on the murder charges. The court admitted in evidence several photos of the scene of the murders, objects found at the scene of the murders, photos of messages that Nightingale sent to acquaintances regarding the night of the murders, and the letter from Nightingale to his attorney found in Nightingale's backpack. The State introduced testimony from a DNA expert, a detective who obtained cell phone record information to track the location of Nightingale's phone on the night of the murders, officers involved in Nightingale's arrest and detention, and acquaintances of Nightingale. The State presented evidence that Nightingale had stated in text messages and other communications to others that his ATV had been stolen and used in connection with the murders and that

he had told an investigator he had been kidnapped by "two Mexicans" who committed the murders.[3]

[¶11] Nightingale did not present evidence or testify at trial. However, he sought to question, in the presence of the jury, the Maine State Police investigator who had listened to Nightingale's jail telephone calls, specifically on whether the investigator had kept any notes of the calls. The court denied the request, pointing out that it had already determined that the State had not acted improperly and had complied with its discovery obligations regarding the calls. Relying on Maine Rule of Evidence 403, the court indicated that "it's my concern it's only going to cause the jury to divert its attention from the focus of this case. And so on a 403 ruling, . . . I find that the probative value [is] substantially outweighed by the waste of time, undue delay, and confusion of what their focus needs to be."

[¶12] During its initial closing argument, the State summarized the evidence and said that after evaluating the evidence the jury would "have a conscientious belief based on the evidence that the charges are almost certainly

---

[3] Before trial, the State filed a motion in limine to "exclud[e] evidence relating to the detention of two Mexican nationals by the United States Department of Homeland Security at a border checkpoint on August 13, 2019"; the court denied that motion. The parties stipulated that "[o]n August 13, 2019, at 6:30 a.m., the United States Department of Homeland Security detained and took into custody two Mexican nationals at a border checkpoint on Interstate 95 in Sherman, Maine. On August 16[], 2019, the Bangor Daily News published an article containing these facts."

true. And knowing that, you must find the defendant guilty." Nightingale objected and orally moved for a mistrial based on prosecutorial error. The court denied the motion. Later, in its rebuttal argument, the State encouraged the jury to focus on "the good evidence, not the trash evidence or the speculation evidence," and commented on the jury's civic responsibility before urging the jury to find Nightingale guilty.

[¶13] The State asked the court to instruct the jury on accomplice liability, pointing out that two guns were used in the murder, that the one found in Nightingale's backpack might not have been the one that fired the fatal shots, and that Nightingale had repeatedly stated that others had committed the murders. Nightingale objected to the instruction. The court overruled the objection, citing the evidence that the murders were committed with two different weapons and the witness testimony about two shapes passing in front of the truck headlights, and included an accomplice liability instruction in its instructions to the jury.

[¶14] The jury found Nightingale guilty of both counts of murder. In a separate bench trial, the court found Nightingale guilty of Count 4, criminal threatening with a dangerous weapon, and Counts 5 and 6, possession of a firearm by a prohibited person.

[¶15]   The court held a sentencing hearing on December 8, 2022. Members of Ellis's and Curtis's families and some of their friends appeared at the hearing, and a few spoke.  Nightingale also spoke at the hearing.  The State asked the court to impose concurrent sentences of life imprisonment on the murder convictions and lesser concurrent sentences on the other charges. Nightingale asked for a sentence of forty-five years' imprisonment on the murder convictions.  The court imposed a life sentence on each murder conviction (concurrent with one another); a five-year sentence on Count 6, concurrent with the sentence for the murder convictions; and a five-year sentence on each of Counts 4 and 5, concurrent with one another but consecutive to the sentence for the murder convictions.  17-A M.R.S. §§ 1602(1)(A)-(B), (2), 1603(1) (2023).

[¶16]   Nightingale timely appealed from the resulting judgment of conviction and filed an application for leave to appeal from his life sentences, which the Sentence Review Panel granted.  *See* 15 M.R.S. §§ 2115, 2151-2152 (2023); M.R. App. P. 2B(b)(1), 20(b).

## II. DISCUSSION

[¶17]  On appeal, Nightingale makes four arguments:

- He asserts that the court erred and abused its discretion in refusing to allow him to question, in the presence of the jury, the State's

primary investigator about the investigator's listening to recordings of telephone conversations Nightingale had with his attorney while in jail.

- He contends that the court erred in giving an accomplice liability instruction because the evidence did not generate any accomplice liability issue.

- He contends that the court erred in denying his motion for a mistrial because of the prosecutor's statements during closing argument.

- He contends that the court erred by failing to consider sentences imposed on other defendants for comparable crimes when it set a life sentence as the basic sentence on each of the murder convictions.

## A. Denial of Opportunity to Cross-Examine State's Lead Investigator on Nightingale's Phone Conversations with his Attorney

[¶18] In considering Nightingale's request to question the State's lead investigator in front of the jury about the investigator's monitoring of Nightingale's phone conversations, the court commented that the problem of law enforcement officers listening to conversations between incarcerated defendants and their attorneys is, "from a systematic . . . standpoint, . . . of great interest obviously to the Court, to the bar. But it's my concern it's only going to cause the jury to divert its attention from the focus of this case."

[¶19] Nightingale contends that "the issue presented is whether the [c]ourt abused its discretion in not providing any sanction to the State for its

willful violation of the Maine Rules of Unified Criminal Procedure regarding discovery" and that Nightingale should have been able to question the investigator to impeach his testimony. However, after a hearing on Nightingale's motion for discovery or dismissal, the court issued a detailed order concluding that the State had not heard any privileged communication and there had been no discovery violation. That conclusion did not necessarily preclude the court from granting Nightingale's request to cross-examine the investigator in front of the jury, but it did mean that the requested cross-examination could not be justified as a discovery sanction. Moreover, if the court had granted Nightingale's request, the State would likely have sought to inform the jury that the court had found no discovery violation. The result would be to involve the jury in issues of little, if any, relevance to its task of determining whether the State had met its burden of persuasion. Here, the court appropriately evaluated Nightingale's request under Rule 403 of the Maine Rules of Evidence and decided that the potential for jury confusion and distraction substantially outweighed the minimal probative value of the proposed cross-examination. We see no abuse of discretion in this outcome. *See State v. Poulin*, 2016 ME 110, ¶ 28, 144 A.3d 574.

## B.     The Court's Accomplice Liability Instruction

[¶20]  Nightingale argues that the court erred in providing the jury with an accomplice liability instruction over his objection because there was insufficient evidence to generate the instruction.  The State contends that there was sufficient evidence to generate an instruction because there was evidence that (1) two guns were used in the murders and (2) Nightingale stated that other people committed the murders.

[¶21]  When a defendant raises on appeal a preserved challenge to jury instructions, "[w]e review [the] jury instructions as a whole for prejudicial error, and to ensure that they informed the jury correctly and fairly in all necessary respects of the governing law."  *State v. Tucker*, 2015 ME 68, ¶ 11, 117 A.3d 595 (quotation marks omitted); *see State v. Abdullahi*, 2023 ME 41, ¶ 36, 298 A.3d 815.  "The proper inquiry here is whether the State provided or generated evidence sufficient to justify" the delivery of an accomplice liability instruction.  *Abdullahi*, 2023 ME 41, ¶ 37, 298 A.3d 815; *State v. Caouette*, 462 A.2d 1171, 1175 (Me. 1983) ("The accomplice liability instruction should not be given as a matter of course in every criminal case; it is proper only if the evidence generates an accomplice issue.").

[¶22]  Under accomplice liability principles, a person is guilty of a crime "committed by the conduct of another person" if "[t]he person is an accomplice of such other person in the commission of the crime."  17-A M.R.S. § 57(1), (2)(C) (2023).  "The State must prove something more than the [accomplice's] mere presence, but need not prove an overt act of physical assistance." *State v. Anderson*, 2016 ME 183, ¶ 20, 152 A.2d 623.  Accomplice liability attaches in two ways: (1) "if [a person] intends to promote or facilitate the commission of a crime, and she aids or agrees to aid or attempts to aid another person in planning or committing the crime, and the crime is committed," or (2) if the "crime [that] was committed . . . was a reasonably foreseeable consequence of a person's conduct."  Alexander, *Maine Jury Instruction Manual* § 6-31 at 6-65 (2023 ed.).  Only the first enumerated basis applies here because the State has not asserted that the murders were a "reasonably foreseeable consequence" of prior conduct by Nightingale.  *Id.*; *see State v. Linscott*, 520 A.2d 1067, 1068-70 (Me. 1987).

[¶23]  "[T]o generate the accomplice liability issue, the evidence of the involvement of a second person need only raise the possibility that a member of the jury will entertain a reasonable doubt as to whether the defendant committed the crime alone."  *Caouette*, 462 A.2d at 1175.  Here, a reasonable

factfinder could interpret the admitted evidence as indicating that Nightingale did not commit the murders alone:

- The eyewitness who notified law enforcement reported seeing two shapes pass in front of the headlights of Ellis's truck. Two shooters could have arrived on Nightingale's ATV, the only vehicle other than Ellis's truck that was found at the scene.

- There were two guns used in the murders, but only one was ever found—the .380 handgun found inside Nightingale's backpack when he was arrested. A reasonable juror might decide that, if Nightingale alone had used both guns to commit the murders, either both guns would have been found or both would have disappeared. A reasonable explanation for why only one gun was found is that someone else had possession of the other one.

- Nightingale repeatedly stated that others had committed the crime. Although the State urged the jury to reject any such view of the evidence, it could not assume that the jury would do so.

[¶24] Still, the evidence of accomplice liability was thin; the evidence that Nightingale acted alone was overwhelming. Even if the evidence was insufficient to generate an accomplice liability issue, however, the inclusion of the instruction was not a structural error and was in fact harmless if it was error at all. *State v. Benson*, 155 Me. 115, 124, 151 A.2d 266, 271 (1959). ("There are numerous cases in which it has been held a new trial will not be granted even if instructions are erroneous unless it appears also that they might have been prejudicial to the excepting party." (quotation marks omitted)). Moreover, Nightingale's brief does not point to any prejudice

associated with the accomplice liability instruction. Instead, he asks us to presume prejudice. We decline to do so.

## C. Claims of Prosecutorial Error During Closing Argument

[¶25] Nightingale labels as prosecutorial error three statements made by the prosecutor who delivered the State's closing argument. Nightingale objected only to one of the three, so we review his contention regarding that statement for harmless error. *See State v. Cheney*, 2012 ME 119, ¶¶ 33-34, 55 A.3d 473.

[¶26] During the State's initial closing argument, the prosecutor summarized the State's evidence of Nightingale's guilt and then said:

> [T]o add insult to jury, [Nightingale] concocts a series of ever-changing, increasingly implausible stories trying to cover all the bases of the damning evidence of his commission of the crime. When you consider all the evidence in this case, when you consider and test that evidence by applying your common sense and life experience, when you discard the evidence that is unworthy of your belief or merely unhelpful, and you focus on the evidence that is worthy, . . . you will have no reasonable doubt about who murdered . . . Curtis and . . . Ellis. You will have a conscientious belief based on the evidence that the charges are almost certainly true. And knowing that, *you must find the defendant guilty*.

(Emphasis added.)

[¶27] Nightingale objected and moved for a mistrial. The court denied the motion. "If the defendant objected at trial, we review the comments for

harmless error and affirm the conviction if it is highly probable that the jury's determination of guilt was unaffected by the prosecutor's comments." *Cheney*, 2012 ME 119, ¶ 34, 55 A.3d 473 (quotation marks omitted); M.R.U. Crim. P. 52(a). "We determine the effect of error by looking to the totality of the circumstances, including the severity of the misconduct, the prosecutor's purpose in making the statement (*i.e.*, whether the statement was willful or inadvertent), the weight of the evidence supporting the verdict, jury instructions, and curative instructions." *State v. Dolloff*, 2012 ME 130, ¶ 33, 58 A.3d 1032 (quotation marks omitted). "[T]he State has the burden of persuasion on appeal in a harmless error analysis." *Id.* ¶ 39.

[¶28] Nightingale challenges two portions of these comments. First, he asserts that the prosecutor erred in labeling his statements to others about the crime as being "concoct[ed]," "ever-changing," and "increasingly implausible." However, a prosecutor may criticize a defendant's characterization of the evidence as implausible and unsupported. *State v. Wai Chan*, 2020 ME 91, ¶ 25, 236 A.3d 471 ("A prosecutor is . . . permitted to comment on the plausibility of the defendant's theory" (quotation marks omitted)); *Cheney*, 2012 ME 119, ¶ 35, 55 A.3d 473 ("The State is free, however, to forcefully argue to the jury that the evidence does not support or is not consistent with the defendant's

theory of the case."). It was not inappropriate for the prosecutor to suggest that Nightingale had given various implausible versions of how others had committed the crime. Second, Nightingale contends that the prosecutor's statement that "you must find the defendant guilty" was tantamount to saying that the jury has a duty to convict. *See State v. White*, 2022 ME 54, ¶¶ 9, 12, 24-26, 285 A.3d 262 (concluding that the prosecutor's use of the word "accountable" improperly suggested to the jury that it had a civic duty to convict the defendant). That is indeed what the statement, standing alone, would suggest, but it did not stand alone. It came immediately after the prosecutor told the jury that after weighing the credible evidence, "[y]ou will have a conscientious belief based on the evidence that the charges are almost certainly true." The latter sentence is an accurate statement of the State's burden of persuasion and it paraphrases the court's instruction on the State's burden. The "you must find the defendant guilty" statement, considered in context, followed from the State's characterization of the evidence. Even if we deemed it prosecutorial error, any error was rendered harmless by the court's instruction that any statements in closing arguments were not evidence. *See, e.g.*, *Wai Chan*, 2020 ME 91, ¶ 29, 236 A.3d 471; *Dolloff*, 2012 ME 130, ¶ 75, 58 A.3d 1032.

18

[¶29] Because Nightingale did not object at trial to two other statements by the prosecutor, made during the State's rebuttal, our review of his contentions on appeal regarding them is for obvious error. *Wai Chan*, 2020 ME 91, ¶ 23, 236 A.3d 471; *State v. Lockhart*, 2003 ME 108, ¶ 47, 830 A.2d 433; M.R.U. Crim. P. 52(b). "To show obvious error, there must be (1) an error, (2) that is plain, and (3) that affects substantial rights. If these three conditions are met, we will set aside the jury's verdict only if we conclude that (4) the error seriously affects the fairness and integrity or public reputation of judicial proceedings." *Wai Chan*, 2020 ME 91, ¶ 23, 236 A.3d 471 (footnote, citation, and quotation marks omitted). The defendant has the burden of persuasion on appeal in an obvious error analysis. *Dolloff*, 2012 ME 130, ¶¶ 36, 39, 58 A.3d 1032.

[¶30] "If the defendant, having failed to preserve the objection at trial, demonstrates on appeal that there was prosecutorial misconduct that went unaddressed by the court, the defendant has met the burden of demonstrating error." *Id.* ¶ 36. "[A]n error affects a criminal defendant's substantial rights if the error was sufficiently prejudicial to have affected the outcome of the proceeding." *State v. Pabon*, 2011 ME 100, ¶ 34, 28 A.3d 1147. A "statement will rarely be found to have created a reasonable probability that it affected the

outcome of the proceeding" when the statement was not sufficient to elicit an objection, "particularly when viewed in the overall context of the trial." *Id.* ¶ 38; *see State v. Sholes*, 2020 ME 35, ¶ 23, 227 A.3d 1129.

[¶31]   The prosecutor's two statements that Nightingale argues constitute obvious error are recorded in the trial transcript as follows:

> When you put together the good evidence, not the *trash evidence* or the speculation evidence or the inadequate DNA samples, when you put your faith in quality evidence and test that quality evidence against the law as the [c]ourt will give you, that's what leads you to a verdict.
>
> . . . .
>
> You are asked to do a hard thing.  You are asked to leave your lives.  You are asked to take a financial hit when you leave your lives to come here and do this.  *But being a juror in a criminal case is one of the greatest obligations and highest callings of being a citizen*.  If you follow the law . . . and you apply it to the evidence, that will direct you to your verdict.  That will get you to where you need to be.  That will bring you to the truth of what happened.  And you will know from the truth of the evidence as you reveal it that the murderer in this case is . . . Nightingale.

(Emphasis added.)

[¶32]   The reference to "trash evidence" was not explicitly linked to Nightingale although the linkage is implicit, and the reference plainly was meant to apply to what the prosecutor had previously called Nightingale's "ever-changing, increasingly implausible stories."  We do not endorse the use

of the word "trash" to characterize evidence. *See Dolloff*, 2012 ME 130, ¶¶ 41-42, 58 A.3d 1032. However, the State's view of Nightingale's arguments was already apparent and the use of an inappropriate adjective to describe them does not meet the obvious error standard.

[¶33]   The State's reference to jury service as "one of the greatest obligations and highest callings of being a citizen" was not at all objectionable. Judges frequently emphasize the importance of jury service and the essential constitutional role of juries, and there is no bar to attorneys doing likewise, provided that there is no implication that jury service involves any duty to do anything other than reach a fair and impartial verdict, such as hold a defendant "accountable" or "send a message." *State v. White*, 2022 ME 54, ¶ 24, 285 A.3d 262; *State v. Woodard*, 2013 ME 36, ¶ 36, 68 A.3d 1250; *see cf. United States v. De La Paz-Rentas*, 613 F.3d 18, 26 (1st Cir. 2010) ("The 'do your duty' rhetoric, depending on wording and context, can be used to convey the idea to the jury that their job is to convict.").

**D.    The Absence of Reference to Sentences Imposed for Comparable Crimes in the Court's Sentencing Analysis**

[¶34]   Nightingale argues that the court erred in setting his basic sentence at life in prison without referring to sentences imposed for comparable crimes. He does not dispute, however, that because his crime

involved multiple deaths, it was accompanied by one of the circumstances that we have identified as justifying the imposition of a life sentence rather than a sentence for a term of years. *See State v. Shortsleeves*, 580 A.2d 145, 149-50 (Me. 1990). "We review the determination of the basic sentence de novo for misapplication of legal principles and for an abuse of the court's sentencing power." *Athayde*, 2022 ME 41, ¶ 51, 277 A.3d 387.

[¶35] "In a murder case, the sentencing court employs a two-step process," *State v. Bentley*, 2021 ME 39, ¶ 10, 254 A.3d 1171: (1) "the court shall determine a basic term of imprisonment by considering the particular nature and seriousness of the offense as committed by the individual," and (2) "the court shall determine the maximum term of imprisonment to be imposed by considering all other relevant sentencing factors, both aggravating and mitigating, appropriate to the case," 17-A M.R.S. § 1602(1)(A)-(B), (2).

[¶36] Nightingale's argument is contrary to a well-settled principle in our case law. "[I]t is permissible for the sentencing court to consider comparable sentences at the first step if appropriate, [but] neither the statute nor our case law mandate it." *State v. Nichols*, 2013 ME 71, ¶ 20, 72 A.3d 503; *see Bentley*, 2021 ME 39, ¶ 13, 254 A.3d 1171 (explaining that courts have discretion when "determining the sources and types of information to consider

when imposing a sentence" (quotation marks omitted)); *see, e.g.*, *State v. Leng*, 2021 ME 3, ¶ 19, 244 A.3d 238 ("The court was *not* required, however, to conduct a comparison of Leng's case to similar cases at all—let alone provide an exhaustive enumeration of analogous cases—before setting the basic sentence.").

[¶37] Nightingale relies on *State v. Cookson* and *State v. Waterman* and in arguing that the consideration of comparable cases is required in the first step of the analysis. 2003 ME 136, ¶ 38, 837 A.2d 101; 2010 ME 45, ¶¶ 42-44, 995 A.2d 243. In both cases, we said, "The first step determines the basic period of incarceration by examining the crime [and] the defendant's conduct in committing it, and by looking at other sentences for similar offenses." *Cookson*, 2003 ME 136, ¶ 38, 837 A.2d 101; *see Waterman*, 2010 ME 45, ¶ 43, 995 A.2d 243. We cited the appropriate statutes laying out the two-step analysis, but the language in the statutes does not, as Nightingale suggests, *require* consideration of comparable cases.[4] *See Waterman*, 2010 ME 45, ¶¶ 42-44, 995 A.2d 243 (citing 17-A M.R.S. §§ 1201(1)(A), 1252-C (2009)); *Cookson*, 2003 ME 136, ¶ 38, 837 A.2d 101 (citing 17-A M.R.S.A. §§ 1201(1)(A), 1252-C (2003)). Further, in

---

[4] 17-A M.R.S. 1201 and 1252-C were repealed and replaced in 2019, though the changes are not relevant in this case. *See* P.L. 2019, ch. 113, §§ A-1, A-2 (effective May 16, 2019) (codified at 17-A M.R.S. §§ 1602(1)(A)-(B), (2), 1603(1) (2023)).

2013, after the decisions in *Waterman* and *Cookson*, we clarified that such consideration is not required. *See Nichols*, 2013 ME 71, ¶ 20, 72 A.3d 503 (citing 17-A M.R.S. § 1252-C(1) (2012)) ("Nichols's arguments reflect a popular, but mistaken, belief that the statute requires the court to consider comparable sentences as part of the first step of the statutory sentencing process . . . ."). Here, the court did not err or abuse its discretion in setting the basic sentence.

The entry is:

Judgment affirmed.

---

Verne E. Paradie, Jr., Esq. (orally), Lewiston, for appellant Bobby L. Nightingale

Aaron M. Frey, Attorney General, and Leanne Robbin, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee State of Maine

Aroostook County Unified Criminal Docket docket number CR-2019-40973
FOR CLERK REFERENCE ONLY