MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2024 ME 35
Docket:        And-23-149
Argued:        February 7, 2024
Decided:       May 14, 2024

Panel:         MEAD, HORTON, CONNORS, LAWRENCE, and DOUGLAS, JJ.

STATE OF MAINE

v.

JAQUILLE J. COLEMAN

CONNORS, J.

[¶1]  Jaquille J. Coleman appeals from his conviction for murder, *see* 17-A M.R.S. § 201 (2024), entered by the trial court (Androscoggin, *McKeon, J.*) after a jury trial, and his sentence of forty-seven years.  As to his conviction, he argues that the court abused its discretion by admitting evidence of the victim's state of mind; that the court erred by denying his motion for a mistrial based on a prosecutorial comment that he contends impermissibly shifted the burden of proof; and that even if neither of those two alleged errors alone constitutes prejudicial error, their cumulative effect warrants a new trial.  As to his sentence, he argues that the court erred by considering Coleman's failure to express remorse in his allocution as an aggravating factor.

[¶2]  We reject his arguments and affirm.

## I. BACKGROUND

### A. The Crime and the Trial

[¶3]  Viewing the evidence in the light most favorable to the State, the jury rationally could have found the following.  *See State v. Fay*, 2015 ME 160, ¶ 2, 130 A.3d 364.

[¶4]   In the fall of 2018, Natasha Morgan became pregnant with Coleman's child, and they were living together by the fall of 2019.  By August 2020, Natasha had moved out of the apartment with their daughter; in mid-August, she ended the relationship with Coleman, but he did not want to let her go.  He begged Natasha not to leave him and promised to change.

[¶5]  On August 20, 2020, Coleman went twice to her mother's house looking for her.  He also went to Natasha's grandmother's house, where Natasha was staying.  Natasha shook as Coleman knocked on the door, and her grandmother did not let him in.

[¶6]  Later the same evening, Natasha told Coleman in a text message that he could pick up their daughter at daycare the next day and bring her to Natasha's mother's house in Lewiston in the afternoon.  The following day, August 21, 2020, Natasha and her mother worked together, and after work they

drove to Natasha's mother's house.  Coleman was already there in a silver Chevy Cruze that Natasha's parents had bought for him and Natasha.

[¶7]  Natasha took two car seats from the Chevy Cruze and put them in her mother's car.  She then picked up the baby and gave her to her mother.  While Natasha's mother focused on the baby inside her car, Natasha and Coleman spoke together while Coleman was seated in his car and Natasha was standing between the two cars.  Natasha's mother then heard a "bunch of pops" and turned to look at Coleman and Natasha after the first shot.  She saw Coleman firing a gun at Natasha.  Natasha's mother got out of the car and saw Natasha lying on the ground.  Natasha's mother headed toward Coleman but stopped when Coleman pointed the gun at her.  Coleman drove away in the Chevy Cruze as Natasha's mother screamed to Natasha's stepfather as he came out of the house, "Tim, he shot her, Tim, he shot her."  Natasha's stepfather also saw Coleman driving away.

[¶8]  The State police collected three bullets and two shell casings at the scene.  The police also found the Chevy Cruze that Coleman had been driving parked on another street in Lewiston.  The police found two more shell casings in the car.  Ballistics testing later confirmed that all the bullets and casings collected at the scene and in the Chevy Cruze were fired from the same

4

.45 caliber gun (although the gun was never found). Natasha was pronounced dead at the hospital from the gunshot wounds. Five days later, local police found Coleman in Mississippi in a rental car, and he was extradited to Maine.

[¶9] Coleman was indicted for murder, in October 2020, followed by a three-day jury trial held in November 2022. In closing arguments, Coleman's counsel suggested that the crime had been perpetrated by a woman named Emily Staples, who had been found with Coleman in Georgia when he was arrested.[1] In making this argument, Coleman's counsel challenged the testimony of Natasha's mother, noting, inter alia, that she had not initially seen the shooting but first heard pops. Coleman's counsel also suggested that Staples had been in the Chevy Cruze with Coleman. In rebuttal, the State responded by noting that Natasha's mother had repeatedly shouted "he shot her," after which the prosecutor stated, "I will say again your decision must be based on the evidence. Where is there any evidence that anyone besides the defendant shot Natasha?"

[¶10] Coleman then moved for a mistrial, arguing that the prosecutor's query impermissibly shifted the burden of proof to him. The court denied the motion, concluding that the prosecutor's query had been a fair comment on the

---

[1] Coleman subpoenaed Staples but she did not testify, invoking her Fifth Amendment privilege.

evidence. The court also immediately thereafter instructed the jury that it was the State's burden to prove the defendant's guilt beyond a reasonable doubt, that the defendant had no obligation to offer evidence, and that the opening and closing arguments were not evidence.

## B. Sentencing

[¶11] The court held a sentencing hearing in April 2023. Coleman chose to allocute during that hearing. In his allocution, he did not acknowledge that he had committed the crime. Instead, he apologized for "fail[ing] to protect" Natasha. He went on at some length, noting that Natasha "did not deserve to die," that her death was "unexpected," that "[s]ometimes in life things happen. We may not want them to but they do, and we just have to do our best to move on," and that he was "disturb[ed]" by this event. The thrust of his remarks was to distance himself from Natasha's murder and even to portray it as a loss that he had suffered. (*E.g.*, "I spend a lot of my time trying to figure out how to pick up the threads of an old life, but how do you go on . . . ?")

[¶12] The court set the basic sentence at forty years based on the presence of the child, evidence of premeditation, and the fact that the crime was committed with a firearm. *See* 17-A M.R.S. § 1602(2) (2024). The court considered the following to be aggravating factors: the impact of Natasha's

6

death on her family, Coleman's criminal history, Coleman's jealousy as the motivation for the murder, and Coleman's lack of remorse. The court considered Coleman's history of employment and difficult childhood to be mitigating factors. Finding that the aggravating factors outweighed the mitigating factors, the court finalized Coleman's sentence at 47 years.

[¶13] Coleman timely appealed the conviction and sentence, M.R. App. P. 2B(b)(1); 15 M.R.S. § 2115 (2024), and the Sentence Review Panel granted Coleman leave to appeal the sentence.

## II. DISCUSSION

### A. The challenged evidence was admissible because it was relevant to show Coleman's motive.

[¶14] During trial, the court admitted over objection evidence that Natasha had told a friend that she was afraid of Coleman and that the friend and Natasha had developed a "safe word" to signal to the friend to call the police. Relying on our decision in *State v. Penley*, 2023 ME 7, 288 A.3d 1183, issued after the trial in this case, Coleman argues that the court erred in admitting this evidence of Natasha's state of mind. On appeal, also citing *Penley*, the State does not defend the admission of the evidence but argues that it was harmless.

[¶15] As a threshold matter, both parties appear to read too much into our decision in *Penley*. There, we noted that statements from a murder victim

that the victim was afraid of the defendant are generally not admissible despite M.R. Evid. 803(3)[2] because such statements are typically not probative of the defendant's state of mind and the danger of unfair prejudice resulting from the admission of such statements is high. *Penley*, 2023 ME 7, ¶¶ 4, 18, 288 A.3d 1183. If such "state of mind" statements are excluded, however, it is on grounds of limited relevance or substantial prejudice, or both, under M.R. Evid. 401-403, not because they are outside the ambit of Rule 803(3).[3] *See Capano v. State*, 781 A.2d 556, 612-13 (Del. 2001) ("[T]he statement 'I fear Defendant' falls within the proper scope of Rule 803(3). . . . The concern is that a victim's statement that 'I fear Defendant' leads to an inference that the defendant deserves to be feared. Courts are wary of allowing jurors to draw this inference because it may be based on subjective impressions but have great impact." (footnotes omitted)).

[¶16] While in *Penley* we noted, and we re-affirm here, that such "I fear" statements should generally be excluded under Rule 403, *see Penley*, 2023 ME

---

[2] M.R. Evid. 803(3) provides that "[a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health)" are not excluded by the rule against hearsay regardless of whether the declarant is available as a witness.

[3] M.R. Evid. 401 and 402 provide for the admissibility of relevant evidence, i.e., evidence that has a tendency to make a fact more or less probable than it would be without the evidence, and Rule 403 provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice."

7, ¶ 18, 288 A.3d 1183, there can be exceptions, such as when the evidence is relevant to show motive. *See United States v. Tokars*, 95 F.3d 1520, 1535 (11th Cir. 1996) ("[A]t least when relevant to the motive to kill, evidence of the victim's state of mind is admissible under Federal Rule of Evidence 803(3).")[4]

[¶17] Here, the challenged statements were made contemporaneously with Natasha's termination of her relationship with Coleman, while Coleman begged her to stay and took actions to pursue her. Natasha's statements and arrangement with her friend regarding a safe word can be understood as reflecting the breakdown of Coleman and Natasha's relationship as well as Coleman's reaction to it: Natasha was fleeing the relationship that Coleman

---

[4] Title 17-A M.R.S. § 201(1)(A) (2024) provides that a person is guilty of murder if the person "[i]ntentionally or knowingly causes the death of another human being." While motive is not an element that the State must prove, evidence of motive is admissible and relevant in proving the element of intent. *See State v. Sexton*, 2017 ME 65, ¶ 39, 159 A.3d 335; *State v. Heald*, 393 A.2d 537, 542 (Me. 1978); *State v. Merry*, 136 Me. 243, 247-48, 8 A.2d 143, 146-47 (1939); *State v. Dilley*, 2008 ME 5, ¶ 30, 938 A.2d 804 ("In criminal trials involving an intent element, we have repeatedly held that evidence of the prior relationship between the accused and the victim is relevant and admissible to establish the accused's motive, intent, or opportunity to commit the crime, or to demonstrate the absence of any mistake or accident."); *State v. Lewisohn*, 379 A.2d 1192, 1201 (Me. 1977) ("The prior relationship between the accused and his victim, including their mutual temper and their feelings towards each other, was relevant to show motive and the absence of any mistake or accident."). Similarly, evidence of premeditation is "properly admissible, not because the State must prove 'premeditation' beyond a reasonable doubt, but because it is relevant and material as tending to prove beyond a reasonable doubt one circumstance, inter alia, which can make a killing unlawful." *State v. Lafferty*, 309 A.2d 647, 664-65 (Me. 1973).

wanted to continue, thus supporting the State's theory of Coleman's motive for the murder, which Coleman disputed at trial.[5]

[¶18]   In this context, given the broad deference afforded the court in making admissibility determinations under Rule 403, *see State v. Tanguay*, 574 A.2d 1359, 1362 (Me. 1990), we cannot conclude that the court abused its discretion in admitting the statements.[6]  *See United States v. Donley,* 878 F.2d 735, 737-39 (3rd Cir. 1989) (murder victim's intent to separate from defendant admissible to support motive); *State v. Wood*, 881 P.2d 1158, 1167 (Ariz. 1994) (where the existence of premeditation is at issue, evidence of relationship difficulties between the defendant and victim are admissible); *Capano*, 781 A.2d at 615 ("[W]e find that testimony describing [the victim's] state of mind was

---

[5] In its opening statement, the State said that "Coleman did not want to let her go" and noted that while premeditation is not an element of murder under Maine law, evidence of premeditation could support a finding that Coleman acted intentionally.  In Coleman's opening argument, his counsel said that "[t]here was no motive for Mr. Coleman to harm Natasha Morgan on that date.  You won't see a motive," and acknowledged that the State's theory as to motive was that Coleman did not want Natasha to break up with him.

[6] In any event, even when we determine that a court has abused its discretion in admitting evidence, the abuse of discretion will not require vacatur if it constitutes harmless error, *State v. Penley*, 2023 ME 7, ¶ 9, 288 A.3d 1183, i.e., if "it is highly probable the error did not affect the jury's verdict." *State v. Donovan*, 1997 ME 181, ¶ 9, 698 A.2d 1045.  As in *Penley*, there is ample evidence to support the conviction in addition to the victim's statements.  The evidence is overwhelming that Coleman shot Natasha.  Coleman did not want to break up with Natasha and begged her to stay.  Natasha's mother was in the driveway with Natasha and Coleman, heard the gun shots, saw Coleman in his car turn toward Natasha holding the gun, and saw Natasha's body on the ground.  She saw only one person in Coleman's car, and when she approached Coleman, he pointed the gun at her and fled.  The bullets and casings at the scene match those in the car driven by Coleman.  Even if the court's admission of the evidence of Natasha's statements had been an abuse of discretion, the admission of that evidence would be harmless.

relevant to prove (1) that [the victim] sought to end her romantic involvement with [the defendant] and (2) that [the defendant], as the spurned lover, therefore had a motive to kill her.")

**B.     The court did not err when it denied Coleman's motion for a mistrial because the prosecutor's query was made in response to Coleman's argument, was made in the context of focusing on the evidence as presented, and was followed immediately by an instruction that the State bore the burden of proof and that closing arguments were not evidence.**

[¶19]  Coleman argues that the State impermissibly shifted the burden of proof to him during closing argument when the prosecutor stated, "Where is there any evidence that anyone besides the defendant shot Natasha?" and that the court therefore erred in declining to order a mistrial.

[¶20]  Here again, citation to *Penley* is appropriate:

> We review claims of error arising from prosecutorial conduct to determine, first, whether the conduct was in error.  If it was in error, we review each of the State's comments individually but also consider all comments as a whole in determining whether to vacate the conviction.  We will affirm the judgment if "it is highly probable that the jury's determination of guilt was unaffected by the prosecutor's comments."

> A closing argument is improper if it conveys a shift in the burden of proof to the defendant or suggests "that the defendant must present evidence in a criminal trial."  A prosecutor must "focus . . . on the evidence itself and what the evidence shows or does not show, rather than on the defendant and what he or she has shown or failed to show."

*Penley*, 2023 ME 7, ¶ 23-24, 288 A.3d 1183 (citations omitted).

[¶21]   In *Penley*, applying an obvious error standard of review, we rejected the defendant's argument that a mistrial was compelled based on a stray remark in closing by the State that improperly implied that the defendant had a burden of proof.  *Id.* at ¶ 29.  We so concluded citing the prosecutor's subsequent arguments properly addressing the state and weight of the evidence in the record and the fact that the remark was followed by an instruction that the defendant never carried the burden of proof and that closing arguments are not evidence.  *Id.*

[¶22]   Similarly, here we have an immediate instruction regarding the proper burden of proof, and we must also read the prosecutor's remark in context.  The prosecutor made the contested comment after pointing to the evidence that the State had presented.   Fairly understood, the remark, responding to Coleman's speculation as to an alternate suspect, constituted a component of the prosecutor's review of the record evidence, which included identifying the lack of any support for such speculation in contrast to the strength of the evidence that Coleman killed Natasha.  The use of a rhetorical question was at most inartful, not error, and even if error, "it is highly probable that the jury's determination of guilt was unaffected by the prosecutor's

comments." *State v. Cheney*, 2012 ME 119, ¶ 34, 55 A.3d 473 (quotation marks

omitted); *see also* M.R.U. Crim. P. 52(a).[7]

## C. The sentencing court properly considered the substance of Coleman's allocution in assessing lack of remorse as an aggravating factor.

[¶23] In sentencing Coleman, the court stated, "I haven't heard remorse

on Mr. Coleman's part. I didn't hear it in his statement. I don't hear genuine

remorse. That's an aggravating factor." We have stated, multiple times, that

lack of remorse may be considered an aggravating factor in sentencing. *E.g.*,

*State v. Roberts*, 641 A.2d 177, 179 (Me. 1994); *State v. Reese*, 2010 ME 30, ¶ 31,

991 A.2d 806; *State v. Berube*, 1997 ME 165, ¶ 13, 698 A.2d 509.

[¶24] Coleman argues, however, that in this instance, there was a

constitutional violation because, by weighing the content of his allocution

against him, the sentencing court violated his right against self-incrimination

under the Fifth and Fourteenth Amendments of the United States Constitution.[8]

"We review de novo a claim that a constitutional violation has occurred at

---

[7] Because we find no error in either the admission of Natasha's statements or the prosecutor's comment, we need not address Coleman's argument as to the cumulative weight of these claimed errors. In any event, even if these had constituted errors, they would not have cumulatively deprived Coleman of a fair trial. *See State v. Dolloff*, 2012 ME 130, ¶ 74, 58 A.3d 1032; *State v. Hassan*, 2013 ME 98, ¶¶ 37-38, 82 A.3d 86 (Jabar, J., dissenting).

[8] Coleman did not invoke his right not to be compelled to give evidence against himself under article 1, section 6 of the Maine Constitution, and we therefore focus only on his federal right.

sentencing," *State v. Moore*, 2023 ME 18, ¶ 23, 290 A.3d 533, but because Coleman raises this argument for the first time before us, our standard of review is only for obvious error; accordingly, we will vacate his sentence "only if the alleged impropriety is obvious and worked a manifest injustice on the defendant." *State v. Ilsley*, 604 A.2d 17, 18 (Me. 1992).

[¶25]  The U.S. Supreme Court has held that the protection against self-incrimination extends to sentencing hearings.  *Mitchell v. United States*, 526 U.S. 314, 316-17 (1999).  The Supreme Court, however, also stated in *Mitchell*, "Whether silence bears upon the determination of a lack of remorse, or upon acceptance of responsibility for purposes of the downward adjustment provided in [federal sentencing guidelines], is a separate question.  It is not before us, and we express no view on it."  *Id*. at 330.

[¶26] We agree with other courts that have held that choosing to allocute constitutes a limited Fifth Amendment waiver, and that the lack of remorse expressed in an allocution may be considered as a factor in sentencing.  *See, e.g.*, *United States v. Whitten*, 610 F.3d 168, 199 (2d Cir. 2010) ("[W]e hold that an unsworn, uncrossed allocution constitutes a limited Fifth Amendment waiver that allows the prosecution to argue for an adverse inference from a defendant's failure to *testify* as to that to which he has *allocuted*."); *People v.*

*McBride*, 228 P.3d 216, 228 (Colo. App. 2009) ("Defendant's Fifth Amendment claim necessarily fails because he *waived* his right to remain silent at sentencing when he chose (in his words) to 'speak my piece.' . . . There is no constitutional right to be free from a court considering a dissembling sentencing allocution."); *United States v. Bryant*, 618 F. App'x. 586, 590 (11th Cir. 2015) ("We have stated that where a defendant chooses to allocute at his sentencing hearing without pressure from the court and repeatedly denies any wrongdoing, the court is permitted to consider the defendant's freely offered statements indicating a lack of remorse in sentencing. Just as a jury weighs a defendant's testimony once he waives his Fifth Amendment privilege at trial, a judge may consider a defendant's freely offered allocution regarding remorse during sentencing." (citation and quotation marks omitted)); *United States v. Tomey*, 783 F. App'x. 832, 848 (11th Cir. 2019) ("[B]ecause [the defendant] voluntarily addressed the court during trial and at sentencing, the district court did not err when it considered his lack of remorse.").

[¶27] Because Coleman voluntarily chose to allocute, the sentencing court was free to consider the content of that allocution, and the court's conclusion that Coleman failed to show any remorse was more than reasonable.

The entry is:

Judgment affirmed.

---

Rory A. McNamara, Esq. (orally), Drake Law LLC, York, for appellant Jaquille Coleman

Aaron M. Frey, Attorney General, and Donald W. Macomber, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee State of Maine

Androscoggin County Unified Criminal Docket docket number CR-2020-1797
<span style="font-variant: small-caps;">For Clerk§ Reference Only</span>