MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2023 ME 7
Docket:        Oxf-21-400
Argued:        October 5, 2022
Decided:       January 19, 2023

Panel:         STANFILL, C.J., and MEAD, JABAR, CONNORS, and LAWRENCE, JJ.

STATE OF MAINE

v.

MARK D. PENLEY

LAWRENCE, J.

[¶1]  Mark D. Penley appeals from a judgment of conviction of two counts of intentional or knowing murder, 17-A M.R.S. § 201(1)(A) (2018),[1] entered by the trial court (Oxford County, *Warren, J.*) after a jury trial and from his two concurrent life sentences.  He challenges the court's admission of evidence that one of the victims was planning to seek a court order of protection from abuse against him in the days before the victims' deaths; the court's failure to respond to the prosecutor's suggestion, during closing argument, that Penley had a

---

[1]  Because of statutory amendments enacted since the relevant time, *see, e.g.*, P.L. 2019, ch. 462, § 3 (effective Sept. 19, 2019) (codified at 17-A M.R.S. § 201(4) (2022)); P.L. 2019, ch. 113, §§ A-1, A-2 (emergency, effective May 16, 2019) (repealing and replacing sentencing statutes), this opinion cites the substantive statutes, including the statutes governing the imposition of the sentences, that were in effect at the time of the victims' deaths in January 2019.  *See State v. Hardy*, 489 A.2d 508, 512 (Me. 1985) (holding that "the wrongdoer must be punished pursuant to the law in effect at the time of the offense").

2

burden of proof; and the court's consideration of domestic violence in determining the basic term of imprisonment for the crimes. We affirm the judgment of conviction but vacate the sentences and remand for resentencing consistent with this opinion.

## I. BACKGROUND

[¶2] Viewing the evidence in the light most favorable to the State, the jury rationally could have found the following facts beyond a reasonable doubt. *See State v. Gatto*, 2020 ME 61, ¶ 16, 232 A.3d 228. On the night of January 1, 2019, Penley went to the apartment of Dana Hill, where he knew his ex-girlfriend, Heather Bickford, was staying, and in the presence of Bickford's two young children,[2] repeatedly shot Bickford and Hill, causing their deaths.

[¶3] On January 4, 2019, Penley was charged by complaint with two counts of murder, 17-A M.R.S. § 201(1)(A), for the deaths of the two victims. A grand jury indicted him for those charges in February 2019. Penley pleaded not guilty to both charges.

[¶4] Penley moved in limine to exclude testimony from witnesses who had heard from Bickford, shortly before her death, that she feared him and was

---

[2] Although Penley had treated the oldest child as his own and wanted to be the father of both children, Hill was the children's biological father.

planning to seek a court order of protection against him. The State moved in limine for the court to admit statements that Bickford had made to others about her fear of Penley and her intention to seek an order of protection from abuse. After a nontestimonial hearing, the court ruled preliminarily that Bickford's statements to others would be admissible to the extent that they were evidence of her existing mental state, intent, or plan, *see* M.R. Evid. 803(3), but that her reasons for wanting to obtain an order of protection—i.e., her underlying reports of Penley's conduct toward her—would not be admissible.

[¶5] The court held a nine-day trial in October 2021. In addition to other testimony and evidence, the court admitted the following testimony, which Penley challenges on appeal:

- The testimony of Bickford's landlord, a deputy judicial marshal at the Rumford courthouse, that in December 2018 Bickford asked her when the court would be open so that she could obtain a protection order against Penley because she was scared;

- The testimony of Bickford's friend that in late December 2018, Bickford asked her to accompany her to get a protection order, though Bickford did not end up obtaining one because the courthouse was closed;

- The testimony of another friend of Bickford's that on December 28, 2018, he accompanied Bickford to the South Paris courthouse to speak with a law enforcement officer because she had told him she was scared of Penley; and

- The testimony of a police officer that at the courthouse on December 28, Bickford met with him and told him that she feared Penley and was going

4

to obtain a protection from abuse order against him, and that Bickford provided the officer with a description of Penley's vehicle so that the officer could keep a lookout for it while Bickford stayed at Hill's apartment.

[¶6] After the presentation of evidence, the jury heard closing arguments from the parties. Penley's counsel argued, in part, that the State had manipulated evidence:

> Now, the last thing . . . that I [will] go over with you, ladies and gentlemen, is what I call manipulation of evidence, manipulation of the facts, whether it's to correct the mistakes that have been made, to supplement data. That's happening here and it needs to be pointed out.

Counsel addressed multiple instances of what he characterized as manipulation, including the State's handling of Facebook phone location tracking data, which he described as "putting it in the order that [they] want, manipulation of the evidence, manipulation of what they get from Facebook, correcting the errors that they see."[3]

[¶7] The State responded with the now-challenged assertion that "it's easy to make an accusation and not have to back it up with evidence." The prosecutor elaborated and argued that Facebook has a financial motivation for ensuring the accuracy of its records and that other evidence, including a

---

[3] The detective who examined the Facebook GPS phone location records testified at length to explain the records. He indicated that he had had to sort the data by date and time.

surveillance video and receipts found in his vehicle, showed that during the day of the killings Penley was present at locations that were consistent with the locations for his phone compiled by Facebook's phone tracking system. Penley did not object at trial to the prosecutor's arguments.

[¶8] The jury found Penley guilty of both charged crimes. The court held a sentencing hearing on November 23, 2021. The court heard from family members of the victims and considered arguments from both parties before delivering its sentences. The court considered the purposes of sentencing and conducted the requisite two-step sentencing analysis.[4] *See* 17-A M.R.S. § 1252-C(1)-(2) (2018); *State v. Bentley*, 2021 ME 39, ¶ 10, 254 A.3d 1171.

[¶9] The court first considered the objective nature and seriousness of the crimes to determine the "basic" term of imprisonment—the first step in the statutory sentencing process. *See* 17-A M.R.S. § 1252-C(1). The court set the basic term of imprisonment for the crimes at life imprisonment, with the sentences to run concurrently. The court based its determination on several factors indicating that the murders were among the most serious: Penley intended to kill multiple victims, the killings were premeditated, there were

---

[4] There is no third step in murder sentencing because no period of probation is authorized. *See* 17-A M.R.S. § 1201(1)(A) (2018).

6

signs of domestic violence in both the relationship with Bickford and the committed crimes, and children were present at the scene of the murder. The court then went on at some length about domestic violence:

> And on the domestic violence issue, I don't have before me evidence of exactly what happened during the ten-year relationship. That seems to have been an on and off relationship in part, but there was a lot of evidence about the end of that relationship and although . . . it's definitely fair to state that there appears to have been a complicated relationship there, because they remained together . . . at least to some degree, even after Mr. Penley learned that [the older child] was not his child, by the end . . . it had soured to the point where Mr. Penley, based on those Facebook messages, had descended into what I can only describe as viciousness . . . . And based on some of the testimony at trial he was doing at the end stalking.
>
> I have no reason to know what happened earlier in the relationship but it seems to have been triggered . . . at least in part by . . . the fact that not only was [Bickford] leaving but the fact she was going to someone else, particularly Mr. Hill, who [Penley] demonstrated, I think it's safe to say, extreme hatred for.

[¶10] In arriving at the basic term of imprisonment for the crimes, the court also compared the facts of this case to two other cases where sentencing courts imposed a basic term of imprisonment of life in prison when children were present at the scene of the crime. *See State v. Waterman*, 2010 ME 45, ¶ 46, 995 A.2d 243 (holding that placing children close to a scene of violence or murder can contribute to a determination that the murder is among the most serious); *State v. Hayden*, 2014 ME 31, ¶¶ 4-6, 19, 86 A.3d 1221 (affirming the

court's determination of a basic period of incarceration of life in prison when the murder occurred in front of children and involved multiple victims, extreme cruelty, and domestic violence).

[¶11] In the second step, the court examined the mitigating and aggravating factors to determine the maximum sentences. *See* 17-A M.R.S. § 1252-C(2). In mitigation, the court found that Penley was a productive member of society in that he held down a job and provided for Bickford and the oldest child when they were together and that he was a loving father to the oldest child even after he learned that he was not the child's biological father. As aggravating factors, the court considered Penley's prior misdemeanor convictions, the conscious pain and suffering of Bickford, and the impact on the families of the victims, including the victims' two children. The court concluded that the aggravating factors outweighed the mitigating factors and imposed two concurrent life sentences. The court also ordered Penley to pay $11,423.63 in restitution to the Victims' Compensation Fund and statutorily required fees of $70. *See* 5 M.R.S. § 3360-I (2018).

[¶12] Penley timely appealed from the judgment of conviction and successfully applied to the Sentence Review Panel for appellate review of his sentences after the trial court enlarged the time for him to file the petition for

sentence review. *See* 15 M.R.S. §§ 2115, 2151-2152 (2022); M.R. App. P. 2B(b)(1), 20(h). We review Penley's sentences as a part of his appeal from the judgment of conviction. *See* M.R. App. P. 20(h).

## II. DISCUSSION

[¶13] Penley argues that the court erred in (A) admitting evidence of Bickford's fear of Penley and intention to obtain a protection order against him, (B) allowing prosecutorial arguments in closing that implied that Penley had a burden of proof, and (C) improperly taking domestic violence into account when setting the basic term of imprisonment for the crimes. We address each issue in turn.

## A. Evidence of the Victim's Intention to Seek a Protection Order

[¶14] Penley and the State agree that the trial court properly excluded evidence of Bickford's statements to others about Penley's previous conduct. *See* M.R. Evid. 404(b) ("Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."). Penley contends, however, that the court erred in admitting evidence that Bickford told others that she was afraid of Penley and wanted a protection from abuse order against him. Penley contends that the evidence was hearsay that is not probative of

Penley's motive or his relationship with Bickford and that its admission—even to establish Bickford's then-existing state of mind, *see* M.R. Evid. 803(3)—was unfairly prejudicial and resulted in the jury considering impermissible evidence suggesting prior bad acts to show that Penley acted in conformity with those acts in committing the charged crime, *see* M.R. Evid. 403, 404, 803(3).

[¶15]   We review a ruling admitting or excluding alleged hearsay evidence for an abuse of discretion. *State v. Tieman*, 2019 ME 60, ¶ 12, 207 A.3d 618.  Hearsay—a statement not made while testifying at the current trial or hearing that is offered in evidence to prove the truth of the matter asserted in the statement—is generally inadmissible.  *See* M.R. Evid. 801(c), 802.  Evidence is admissible notwithstanding the hearsay rule, however, if it is "[a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan)." M.R. Evid. 803(3).  "[T]he state of mind hearsay exception [is] limited to evidence that is highly relevant and uttered in circumstances indicating its truthfulness above and beyond the reliability presumed of all statements of present mental state."  *State v. Mahaney*, 437 A.2d 613, 617 (Me. 1981) (quotation marks omitted).  In addition to the Rule 803(3) requirement that state-of-mind evidence be "highly relevant," *see id.*, Rule 403 of the Maine Rules of Evidence calls for the exclusion of evidence if "its probative value is

substantially outweighed by a danger of . . . unfair prejudice." That determination is reviewed for an abuse of discretion. *See State v. Williams*, 2020 ME 128, ¶ 29, 241 A.3d 835.

[¶16] Considering the state-of-mind exception in conjunction with Rule 403, we agree with other jurisdictions holding that a murder victim's state of mind is generally not probative of the *defendant's* state of mind and should not be admitted unless it is relevant to rebut a defense or justification that brings the deceased person's state of mind into question. *See, e.g.*, *Woods v. State*, 733 So. 2d 980, 987-88 (Fla. 1999) (referencing as examples arguments that the death resulted from self-defense, suicide, or accident). The Minnesota Supreme Court held, for instance, that testimony about a victim's emotional state three months before the murder, when she was seeking an order for protection based on the defendant's previous conduct, did not bear on the defendant's motive to commit the charged crime. *State v. Bauer*, 598 N.W.2d 352, 357, 366-67 (Minn. 1999), *overruled in part on other grounds by State v. McCoy*, 682 N.W.2d 153, 160 n.6 (Minn. 2004). The Colorado Supreme Court similarly held that testimony concerning the victim's opinion that the defendant would kill her was not proper state-of-mind evidence because references to her state of fear were "significantly overshadowed by references

to other matters not encompassed by the state of mind exception." *People v. Madson*, 638 P.2d 18, 24-25, 30 (Colo. 1981).

[¶17] As the Supreme Court of Florida stated, "The victim's hearsay statements in a homicide case that the victim was afraid of the defendant generally are not admissible under the state of mind exception because the victim's state of mind is not a material issue in a murder case." *Stoll v. State*, 762 So. 2d 870, 874 (Fla. 2000); *see also Anderson v. State*, 15 S.W.3d 177, 184 (Tex. App. 2000). If the state-of-mind evidence conveys information beyond that expressly contemplated by Maine Rule of Evidence 803(3), there is a significant danger of unfair prejudice. *See Bauer*, 598 N.W.2d at 367; *Madson*, 638 P.2d at 28-31; M.R. Evid. 403.

[¶18] Here, the court abused its discretion in admitting evidence of Bickford's statements that she was afraid of Penley and wanted a protection order against him. Bickford's state of mind was not an element of the crime and was not probative of whether *Penley* had the "conscious object" to kill Bickford and Hill or was the person who did so. 17-A M.R.S. § 35(1)(A) (2018). In other contexts, evidence of a victim's state of mind may have significant probative value and be admissible under Rule 803(3).[5] Such evidence, however, is

---

[5] *See, e.g.*, *People v. Thompson*, 753 P.2d 37, 45-47 (Cal. 1988) (holding that the victim's statement that she feared the defendant might kill her—a statement made on the night of the murder in

12

generally not admissible when (a) the victim's state of mind is not relevant to either an element of a crime or a defense or justification and (b) the danger of unfair prejudice is significant. *See* M.R. Evid. 403, 803(3); *Mahaney*, 437 A.2d at 617.

[¶19]  Nonetheless, "[a]ny error, defect, irregularity, or variance that does not affect substantial rights shall be disregarded."  M.R.U. Crim. P. 52(a).  Here, the court's admission of the challenged evidence and failure to deliver a limiting instruction sua sponte was harmless under this standard given the evidence of Penley's hostile words and conduct toward Bickford before the murders, and the substantial other evidence connecting him to the crime. *See Tieman*, 2019 ME 60, ¶ 18, 207 A.3d 618 (stating that an error is harmless if it is "highly probable the error did not affect the jury's verdict" (quotation marks omitted)).  The evidence included Penley's statement to Bickford in a recorded message: "You're threatening to put a PFA on me?  Good.  I *will* be down tonight.  I fucking *will*.  You want to threaten a fuckin' PFA on me?  Fuck you, you bitch.  Fuck you."  The evidence also included the following:

circumstances suggesting no motive to fabricate—was admissible because it was probative of whether the victim consented to intercourse or was murdered in the commission of a rape as the State charged).

- At the time of the murders, Bickford and Hill were reuniting.

- Penley was enraged that Bickford was spending time at Hill's apartment, and he contacted Bickford incessantly, leaving voice messages demonstrating increasing anger at Bickford and Hill and making threats of violence.

- In the days leading up to the killings, Penley behaved in an intimidating and aggressive manner toward Bickford in the presence of others.

- Penley told a friend that he had previously surreptitiously entered Hill's apartment with a gun while Bickford and the children were asleep there. He also told the friend that if he could not have Bickford, nobody could, and said that he wanted to shoot Bickford and Hill.

- Penley dug at least one grave-sized hole near his home.

- Facebook phone location tracking data indicated that Penley's phone traveled to a lot near Hill's apartment at 5:40 p.m. on the night of the murders and that the phone was turned off or disconnected from the network from that time until 7:27 p.m., when the phone was located in the town where Penley lived, near the home of a member of Penley's family.

- Security footage captured a dark figure entering the area where the killings took place at 5:51 p.m. and exiting at 6:19 p.m., with a person next approaching at 8:25 p.m. Penley called the police from Hill's apartment at 8:26 p.m.

- At the crime scene, police found a gun in Bickford's hand that had a serial number matching a gun box found at Penley's home.

- Eight cartridge casings recovered from the scene bore tool markings that matched the tool markings produced by the gun found at the crime scene. The gun was not excluded as the source of the marks on the bullets recovered from the victims' bodies and the crime scene.

14

- Penley had ammunition in his vehicle and home that matched the ammunition that was fired in Hill's apartment. A gun magazine found in Penley's home was stained with Bickford's blood.

- Penley's boots, which police initially saw at Penley's home but later recovered from the home of a member of Penley's family, had treads that matched tread patterns in blood at the scene of the crime.

- DNA testing revealed Bickford's DNA in the red-brown stains at the bottom of Penley's boots.

[¶20] Given Penley's own mention of Bickford's intent to "put a PFA" on him—and the abundant admissible evidence that Penley was angry at both victims and was linked to the crime scene and the murder weapon—the court's admission of evidence that Bickford feared Penley and wanted to obtain a court order to protect her from him was harmless error.[6] *See State v. Discher*, 597 A.2d 1336, 1338-39, 1342 (Me. 1991) (holding that improperly admitting evidence regarding a statement by the victim's mother was harmless in light of the defendant's own similar statement, together with the other evidence in the case).

---

[6] Furthermore, the prosecutor's closing arguments referencing Bickford's fear, to which Penley raised no objection at trial, do not amount to obvious error given the admissible evidence, summarized in closing, of Penley's intimidating words and conduct toward Bickford before the killings. *See State v. Pratt*, 2020 ME 141, ¶¶ 14, 19, 243 A.3d 469.

**B.    Prosecutorial Error**

[¶21]  Penley argues that the prosecutor undermined the fairness of the proceedings by improperly suggesting in closing argument that Penley had the burden of proving his theory that Facebook phone location tracking data were unreliable, inaccurately indicating that there was no evidence to demonstrate problems with the Facebook data, and improperly disparaging defense counsel for challenging the data "over and over and over and over again."

[¶22]  Because Penley did not object to the State's argument, we review for obvious error.  *See* M.R.U. Crim. P. 52(b); *State v. Sousa*, 2019 ME 171, ¶ 15, 222 A.3d 171.  "To show obvious error, there must be (1) an error, (2) that is plain, and (3) that affects substantial rights."  *Sousa*, 2019 ME 171, ¶ 15, 222 A.3d 171 (quotation marks omitted).  "[I]f these three conditions are met, we will set aside a jury's verdict only if we conclude that (4) the error seriously affects the fairness and integrity or public reputation of judicial proceedings."  *Id.* (quotation marks omitted).  "When a prosecutor's statement is not sufficient to draw an objection, particularly when viewed in the overall context of the trial, that statement will rarely be found to have created a reasonable probability that it affected the outcome of the proceeding."  *Id.* (quotation marks omitted).

[¶23]  We review claims of error arising from prosecutorial conduct to determine, first, whether the conduct was in error.  *State v. Cheney*, 2012 ME 119, ¶ 34, 55 A.3d 473; *State v. White*, 2022 ME 54, ¶ 19 n.9, 285 A.3d 262.  If it was in error, we review each of the State's comments individually but also consider all comments as a whole in determining whether to vacate the conviction.  *Cheney*, 2012 ME 119, ¶ 34, 55 A.3d 473; *White*, 2022 ME 54, ¶ 19 n.9, 285 A.3d 262.  We will affirm the judgment if "it is highly probable that the jury's determination of guilt was unaffected by the prosecutor's comments." *Cheney*, 2012 ME 119, ¶ 34, 55 A.3d 473 (quotation marks omitted).

[¶24]  A closing argument is improper if it conveys a shift in the burden of proof to the defendant or suggests "that the defendant must present evidence in a criminal trial."  *Id.* ¶ 34.  A prosecutor must "focus . . . on the evidence itself and what the evidence shows or does not show, rather than on the defendant and what he or she has shown or failed to show."  *State v. Chan*, 2020 ME 91, ¶ 25, 236 A.3d 471 (quotation marks omitted).  Thus, a prosecutor may say that *the record contains* no evidence to support a proposed finding but may not say that *the defendant failed to provide* evidence to support a proposed finding. *See id.* ¶ 27; *Sousa*, 2019 ME 171, ¶¶ 10-13, 222 A.3d 171.

[¶25]  For instance, we vacated a judgment based on obvious error when a prosecutor improperly shifted the burden of proof when cross-examining a defendant.  *State v. Robbins*, 2019 ME 138, ¶¶ 7, 13-16, 43, 215 A.3d 788.  The prosecutor questioned the defendant about other events occurring at the time the defendant was committing the crime.  *Id.* ¶ 7.  When the defendant corrected the prosecutor to say "allegedly" committing the crime, the prosecutor responded, "No, no there is no . . . allegedly here," because of "testimony on the record" that the defendant committed the crime.  *Id.* (emphasis and quotation marks omitted).  We determined that the prosecutor's comments improperly implied that the burden of the proof shifted to the defendant after the State offered evidence suggesting guilt.  *See id.* ¶¶ 7, 13.

[¶26]  An isolated misstep by a prosecutor might not, however, require us to vacate a judgment of conviction.  For instance, we held that the statement that the defendant "ha[d] no evidence" of someone else committing the crime was improper but did not vacate the judgment when the comment was mild and isolated, the court instructed the jury on the proper burdens soon afterward, and the voluminous evidence of the defendant's guilt suggested that the comment would not have tipped the balance.  *Cheney*, 2012 ME 119, ¶¶ 17, 35-36, 55 A.3d 473 (quotation marks omitted).

[¶27]   Here, Penley asserts one instance of improper burden-shifting during the State's rebuttal closing argument:

> You know, it's easy to make an accusation and not have to back it up with evidence. And with regard to the Facebook records, that's exactly what [defense counsel] tried to do over and over and over and over again.

This statement is improper because it suggested that the defendant had a burden to produce evidence to prove his position and repeatedly failed to do so. The context for the comment, however, at least partially diminishes the deleterious effect of the prosecutor's misstep. Defense counsel had structured his closing argument around several themes, including that the State manipulated evidence. He argued that the State had manipulated the Facebook data by "putting it in the order that [they] want, manipulation of the evidence, manipulation of what they get from Facebook, correcting the errors that they see."

[¶28]   The State responded with the now-challenged assertion that "it's easy to make an accusation and not have to back it up with evidence." The prosecutor elaborated, however, and argued that Facebook has financial motivations for ensuring the accuracy of its records and that other evidence corroborated the Facebook phone location data.

[¶29]  Although the prosecutor's statement taken alone improperly implied that Penley had a burden of proof, the prosecutor's subsequent arguments properly addressed the state of—and weight of—the evidence in the record.  Moreover, the court explicitly instructed the jury after the closing arguments that "[t]he law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence, and you can never rely on the failure of a defendant to offer evidence on any issue." *See id.* ¶¶ 18, 36.  The court also instructed that "the closing arguments of the attorneys in this case are not evidence."  The court thus did not commit obvious error by not, sua sponte, striking the prosecutor's argument or delivering a limiting instruction.[7]

## C.    Sentencing

[¶30]  Lastly, Penley argues that his sentences were improper because, as a matter of law, a consideration of domestic violence belongs only in the second step of the sentencing process, where the court weighs the aggravating

---

[7] We also do not discern obvious error from the cumulative effect of the prosecutor's improper arguments about the Facebook data and about Bickford's statements of her fear and her plan to obtain a protection order.  *See State v. Sholes*, 2020 ME 35, ¶ 9, 227 A.3d 1129; *State v. Gould*, 2012 ME 60, ¶¶ 16-17, 43 A.3d 952.

and mitigating factors. In his view, the court "multi-counted" the domestic violence factor by also considering it in step one.

[¶31] "In a murder case, the sentencing court employs a two-step process." *State v. Athayde*, 2022 ME 41, ¶ 51, 277 A.3d 387 (quotation marks omitted); *see* 17-A M.R.S. § 1252-C(1)-(2). The court first "determines the basic term of imprisonment based on an objective consideration of the particular nature and seriousness of the crime." *Athayde*, 2022 ME 41, ¶ 51, 277 A.3d 387 (quotation marks omitted). Second, "the court determines the maximum period of incarceration based on all other relevant sentencing factors, both aggravating and mitigating, appropriate to that case, including the character of the offender and the offender's criminal history, the effect of the offense on the victim, and the protection of the public interest." *Id.* (alteration and quotation marks omitted). On a discretionary appeal from a sentence, we review "a court's determination of the basic sentence de novo for misapplication of legal principles" and its determination of the maximum period of incarceration for abuse of discretion. *State v. Sweeney*, 2019 ME 164, ¶¶ 11, 17, 221 A.3d 130 (quotation marks omitted).

[¶32] A basic term of imprisonment at or near the top of the statutory sentencing range for the crime is appropriate when a court "finds the

defendant's conduct most serious as compared to other means of committing the crime within that same range." *Hayden*, 2014 ME 31, ¶ 18, 86 A.3d 1221 (quotation marks omitted). By statute, a court must "assign special weight" in sentencing for murder to the fact "[t]hat the victim is a family or household member as defined in Title 19-A, section 4002, subsection 4 who is a victim of domestic violence committed by the convicted person." 17-A M.R.S. § 1251(2)(C) (2018); *see* 19-A M.R.S. § 4002(4) (2018) (defining "family or household members" to include "former domestic partners," meaning "2 unmarried adults who [we]re domiciled together under long-term arrangements that evidence[d] a commitment to remain responsible indefinitely for each other's welfare").

[¶33] If a murder is committed as an act of domestic violence, "that is an objective factor properly considered in the first step of the sentencing analysis." *Athayde*, 2022 ME 41, ¶ 52, 277 A.3d 387 (quotation marks omitted). There may, however, also be "evidence of previous domestic violence apart from the acts constituting the crime itself." *Id.* "In such circumstances, that history of domestic violence would be considered as an aggravating factor in step two of the sentencing analysis." *Id.*

[¶34] The fact that Penley murdered his ex-girlfriend as an act of domestic violence "is an objective factor properly considered in the first step of the sentencing analysis." *State v. Nichols*, 2013 ME 71, ¶ 29, 72 A.3d 503; *see State v. Reese*, 2010 ME 30, ¶ 30, 991 A.2d 806 (holding that in determining the basic sentence the sentencing court acted properly in considering that the crime "occurred within the context of a violent relationship"); *State v. Cookson*, 2003 ME 136, ¶¶ 39, 41, 837 A.2d 101 (finding no error in the sentencing court's determination of the basic sentence when it considered the fact that the "murder was a crime of domestic violence"). The court did not err by considering the objective nature of the murder of Bickford as an act of domestic violence in step one.

[¶35] The court, however, went further and delved into Penley's history with Bickford and Hill in step one by considering the "complicated relationship" between Penley and Bickford over the course of ten years, acts of stalking before the murder, and Penley's burgeoning hatred of Hill. Any history of domestic violence, apart from the commission of the crime itself, is properly considered only in step two. *See Athayde*, 2022 ME 41, ¶ 52, 277 A.3d 387; *cf. Reese*, 2010 ME 30, ¶ 30, 991 A.2d 806 (affirming the consideration of previous threatening words and behavior in setting the basic sentence because

the defendant knew when he committed the charged elevated aggravated assault that his domestic partner would be aware of these prior acts as she tried to escape).

[¶36] The court's analysis here cannot be viewed as harmless error because it may have affected the court's determination of the basic term of imprisonment at life in prison. *See State v. Stanislaw*, 2011 ME 67, ¶ 16, 21 A.3d 91 (holding that when a court misapplies the law in setting the basic term of imprisonment, the court "is left without a foundation on which to build an appropriate sentence," and the sentence must be vacated and the matter remanded for resentencing). Accordingly, we vacate the sentences and remand the matter for resentencing consistent with this opinion.

The entry is:

> Sentences vacated. Matter remanded for resentencing consistent with this opinion. Judgment affirmed in all other respects.

Rory A. McNamara, Esq. (orally), Drake Law LLC, York, for appellant Mark D. Penley

Aaron M. Frey, Attorney General, and Donald W. Macomber, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee State of Maine

24

Oxford County Unified Criminal Docket docket number CR-2019-21
FOR CLERK REFERENCE ONLY