MAINE SUPREME JUDICIAL COURT          Reporter of Decisions
Decision:     2024 ME 80
Docket:      Ken-23-198
Argued:     October 9, 2024
Decided:    December 19, 2024

Panel:       STANFILL, C.J., and MEAD, HORTON, CONNORS, LAWRENCE, and DOUGLAS, JJ.

STATE OF MAINE

v.

DYLAN KETCHAM

HORTON, J.

[¶1]  Dylan Ketcham appeals from a judgment of conviction for the murder of Jordan Johnson, *see* 17-A M.R.S. § 201(1)(A) (2024), entered by the trial court (Kennebec County, *Murphy, J.*) after a jury found Ketcham guilty.  He also appeals convictions in that same judgment for attempted murder (Class A), 17-A M.R.S. §§ 152(1)(A), 201(1)(A), 1604(5)(A) (2024), and elevated aggravated assault (Class A), 17-A M.R.S. § 208-B(1)(A), (2), 1604(5)(A) (2024), against Caleb Trudeau.  Ketcham argues that the court erred in limiting the jury's consideration of text messages and a telephone conversation between Johnson and Trudeau before the crimes occurred and in failing to order a competency evaluation of Ketcham during the trial.  He also challenges the sentence imposed on him for the three crimes as resulting from a

2

misapplication of sentencing principles and constituting an illegal de facto life sentence. We affirm the judgment and the sentence.

## I. BACKGROUND

[¶2] Viewing the evidence in the light most favorable to the State, the jury could rationally have found the following facts beyond a reasonable doubt. *See State v. Michaud*, 1998 ME 251, ¶ 11, 724 A.2d 1222.

[¶3] On January 24, 2020, Ketcham and Johnson exchanged hostile words in a telephone call and in text messages. Trudeau—a friend of both Ketcham and Johnson—also exchanged messages with Johnson about Ketcham. Ketcham and Johnson agreed to meet near a baseball field in Gardiner. Trudeau accompanied Johnson to the arranged meeting, expecting his two friends to have a fistfight. Neither Trudeau nor Johnson brought a weapon. Trudeau hid in nearby trees until he saw Ketcham pull out a gun and aim it at Johnson's head. Trudeau emerged in an effort to stop Ketcham, but Ketcham fired multiple shots before Trudeau could reach him. One of the bullets fired from the gun entered Johnson's brain.

[¶4] Trudeau struggled with Ketcham to get the gun out of Ketcham's hand. The gun ultimately fell to the ground. Ketcham moved to take a machete out of his coat. After trying to prevent Ketcham from unsheathing the machete,

Trudeau fled. While running away, he tripped and fell in the road. Ketcham repeatedly struck him with the machete, resulting in blood loss, severe lacerations to both arms, the near severing of one of Trudeau's wrists, and lacerations to Trudeau's head, neck, and left shoulder. Trudeau lost consciousness. After waking, he went to the nearest house and kicked on the door. After the occupant opened the door and called 9-1-1, Trudeau received medical attention from first responders. Trudeau survived but underwent treatment for six months at Massachusetts General Hospital and still has only limited use of his hands. Johnson died of his injury several days after being shot.

[¶5] On January 27, 2020, the State filed a complaint charging Ketcham with elevated aggravated assault of Trudeau. After Johnson's death, the State filed a complaint on January 29, 2020, charging Ketcham with Johnson's murder. The court ordered a mental examination of Ketcham, which was completed in July 2020, and the court concluded that Ketcham was competent to stand trial.

[¶6] On July 24, 2020, a grand jury indicted Ketcham on charges of (1) elevated aggravated assault of Trudeau, (2) attempted murder of Trudeau, and (3) murder of Johnson. The court (*Murphy, J.*) granted the State leave to

4

amend the indictment to allege Ketcham's use of a firearm, rather than a knife, in the murder of Johnson.

[¶7] The court began a trial on September 20 and 21, 2022, but declared a mistrial based on unfair prejudice after the State played a gory video taken from a police officer's body camera showing both victims at the scene of the crime.

[¶8] Before a new trial began, the State moved in limine to limit the admission of statements in text messages that Johnson and Trudeau sent to each other about doing violence to Ketcham. The State argued that the messages could be admitted only for limited purposes and not to establish that either Johnson or Trudeau was violent on a particular occasion or to justify Ketcham's use of deadly force, given that there was no evidence that he was aware of the communications. Ketcham filed a motion in limine seeking the admission of the statements. The court ruled that the statements exchanged between Johnson and Trudeau before they met up with Ketcham were relevant and admissible only as to the relationship between them and Ketcham, their common scheme or plan, and their states of mind.

[¶9] At a jury trial held on January 18 and 24-27, 2023, the State offered testimony from law enforcement officers, Maine State Police Crime Lab staff,

individuals who heard the argument and gunshots in the early morning of January 25, a medical first responder, an emergency room doctor, the State Medical Examiner, Ketcham's sister, Ketcham's girlfriend at the time of the events, and Trudeau. During Ketcham's cross-examination of Trudeau, Ketcham elicited testimony about the messages that Trudeau and Johnson had exchanged leading up to the confrontation. Trudeau testified that Johnson had said he would "smoke" Ketcham and had asked, "Can we really crack that kid or what?" to which Trudeau replied, "I'm down." Trudeau testified that Johnson also quoted at length a song called "Murder on My Mind." The State objected that the cross-examination was disclosing more messages than the parties had agreed, before trial, would be shared. The court overruled the State's objection.

[¶10] Cross-examination continued and included reference to a comment from Johnson that he would "crack silly dilly with his own bat," to which Trudeau responded with laughing emojis. The bat referenced was "a croquet club or a miniature bat" that was at Johnson's house. The State asked for a "moment" and consulted with Ketcham's counsel about other messages. The court indicated its intention to give a limiting instruction because the messages were not relevant to Ketcham's self-defense justification unless he

6

knew about them, and there was no evidence that he did. That ended the inquiry into the messages.

[¶11] On January 25, Ketcham moved for a judgment of acquittal at the close of the State's case, but the court denied his motion. The court later called attention to Ketcham's demeanor:

> So off the record the Court expressed some—not concern exactly, but just shared some observations of the defendant's demeanor throughout the trial. And what I observed was that he seems to have a flat affect. He seems to be either medicated or shut down somewhat. He's not sleeping at the defense table but he is not reacting to evidence. I see him communicating with counsel on occasion.
>
> So I just wanted to ask if he had been evaluated or if the defense had any concern about his competence.

Ketcham's counsel responded,

> Your Honor, we've had a fair amount of history with this particular individual at this point, and he has definitely gone up and down over the months of our time with him. I think most recently, from at least June or so, he has been pretty clear. In fact there was a time in August when I think he sort of peaked in terms of his clarity, for lack of a better word. And up—right up until the eve of trial we really had very little concern.
>
> But we share the Court's observations, we noticed the same things. And it's caused us a bit of concern throughout the trial. We've kept an eye on it. And as the Court has noted, we made a series of communications with him, I have made sure he is paying attention and understands what's happening. And we certainly brought him in to some of the decisions that have gone on

throughout the trial. And to my mind throughout the trial he has been responsive and appropriate.

And I think today we had a bit of an increased concern because of the way—there's something about today, he really sort of seemed a little different. So we—we had a very specific and lengthy conversation with him about that. And the—I think the take away is after a good long discussion, both with him and after amongst the team, we believe that he is competent. And we're prepared to put memos to the file to that effect.

The court accepted counsel's representations, and the trial continued.

[¶12] The next morning, the parties offered several stipulations, which the Court read to the jury. Ketcham again moved for a judgment of acquittal, and the court again denied his motion.

[¶13] During deliberations, the jury asked to see copies of the messages exchanged between Johnson and Trudeau. Over Ketcham's objection, the court informed counsel that it was going to advise the jury that the text messages could not "be considered on the issue of self-defense" and "were admitted for a separate purpose. . . . Because the defendant was not aware of those exchanges they cannot be considered for the issues the jury has to grapple with, which is whether or not the defendant acted justifiably in self-defense." The court explained, "I admitted them for the limited purpose of showing plan, intent, motive. But I think the law is still the law that unless he knows about it, it doesn't go to the issue of self-defense." Ketcham argued that the jury could

think the messages were "relevant to some plan, maybe, or scheme, just as the Court admitted it for. And I think the Court wrongfully assumes that they're going to use it for some improper purpose. And the Court has already given instructions on all of this." The court did not alter its decision.

[¶14] The jury found Ketcham guilty of all three charged crimes.

[¶15] The court held a sentencing hearing on May 16, 2023. The State's recommendation was for a forty-year sentence for murder and thirty-year sentences for the other two charges, to run concurrently with each other and consecutively to the murder sentence, with all but twenty-five of the thirty years suspended and four years of probation. Ketcham argued that such a sentence would be excessive given that, although he was an adult, he was a young man who had made bad decisions. He sought concurrent twenty-five-year sentences.

[¶16] The court considered each count, beginning with the murder conviction. It set a basic sentence of forty to forty-five years based on the premeditated nature of the act, as evidenced by Ketcham's theft of a gun, use of a stolen credit card to buy ammunition, self-fashioned holster for the machete, and choice of the location to meet Johnson. It also considered that Ketcham intentionally attacked two victims on the same night. The court proceeded to

address the mitigating factors (Ketcham's youth (age twenty-one), immaturity, and lack of a criminal record) and aggravating factors (significant victim impact), treating Ketcham's mental health as neutral given that its ordered psychological evaluation had revealed no identifiable mental illness. At this second stage of sentencing, the court found that a forty-five-year sentence on the murder charge was appropriate.

[¶17] The court then proceeded to address the other charges. It considered them to comprise one course of conduct for which the sentences would run concurrently with each other. As to the basic sentence, the court determined that the "aggression and the brutality of this merciless attack . . . is not just disproportionate, it is, to use an old legal term, it just shocks the conscience." Because of Ketcham's infliction of multiple blows, his taunting of Trudeau while Trudeau was begging for his life, his abandonment of Trudeau to die, and the reality that Trudeau survived only because he found someone to help, the court concluded that a basic sentence of thirty years was appropriate. *See* 17-A M.R.S. § 1604(1)(A) (establishing a thirty-year maximum sentence for a Class A crime).

[¶18] As mitigating factors, the court considered Ketcham's young age, crediting his argument, "to some extent, about what the social science and the

10

law has finally come to recognize as the immaturity of certain young men who live in our community and the fact that some of them take a very, very long time to catch up to the rest of the other young men in the community, and everyone else, and that they do make terrible, terrible decisions." The court also considered, again, Ketcham's lack of a criminal record. The court considered Ketcham's mental health as a neutral factor. As aggravating factors, the court considered the physical and emotional trauma that Trudeau experienced and his disfigurement and loss of physical strength and dexterity. The court concluded that the aggravating factors outweighed the mitigating factors and that a thirty-year sentence was appropriate.

[¶19] Finally, the court determined that Ketcham presents a threat to public safety and must have a period of supervision before living independently in the community. The court ordered that the sentences for the crimes committed against Trudeau run consecutively to the murder sentence because there was a change in the weapon used and because the conduct as to each victim was distinct, particularly given that Ketcham was attempting to "eliminate" Trudeau as an eyewitness to the murder of Johnson.

[¶20] Considering the purposes of sentencing—particularly concerns for public safety and the need to avoid diminishing the gravity of an offense—the court sentenced Ketcham to the following terms of imprisonment:

- forty-five years for the murder;

- thirty years, with all but twenty years suspended, with four years of probation, for the attempted murder (consecutive to the sentence for the murder); and

- fifteen years for the elevated aggravated assault (concurrent with the unsuspended portion of the sentence for the attempted murder).

The court also ordered that Ketcham pay restitution of $1,160.50 for Johnson's memorial monument and $15,150 to the Victims' Compensation Fund.

[¶21] Ketcham timely appealed. *See* 15 M.R.S. § 2115 (2024); M.R. App. P. 2B(b)(1). He filed two notices of appeal, one designating the date of the jury's verdict as the date of the judgment appealed from and the other designating the date of sentencing as the date of the order appealed from. He did not file an application to allow an appeal of the sentence on the form required by M.R. App. P. 20(a)(2). He moved for the notice of appeal designating the date of sentencing to be treated as an application to the Sentence Review Panel for leave to appeal his sentence, and we granted the motion. *See* 15 M.R.S. § 2151 (2024); M.R. App. P. 20. The Sentence Review

12

Panel granted his application, and we have considered the sentence appeal with his appeal from the judgment of conviction. *See* M.R. App. P. 20(h).

## II.  DISCUSSION

### A.     Limitations on Consideration of Messages Exchanged by the Victims

[¶22]  Ketcham challenges (A) the court's limitations on how the jury could consider the text messages exchanged between the victims and (B) the court's refusal to provide the jury with a copy of the messages during deliberations.

#### 1.     Limiting Instruction

[¶23]  Ketcham contends that the court should have allowed the jury to consider the messages exchanged between the victims as evidence relevant to Ketcham's reasonable belief that the use of deadly force was necessary to defend himself from imminent deadly force by the victims.  He argues that the jury could infer from Johnson's messages that Johnson had also conveyed his violent intentions to Ketcham, with whom he had argued on the phone.  He reasons that the jury should have been allowed to infer from that evidence that Johnson had been the initial aggressor and that Trudeau was not credible.

[¶24]  We review for an abuse of discretion a ruling excluding or admitting alleged hearsay evidence. *State v. Penley*, 2023 ME 7, ¶ 15, 288 A.3d

1183. "Hearsay—a statement not made while testifying at the current trial or hearing that is offered in evidence to prove the truth of the matter asserted in the statement—is generally inadmissible. *See* M.R. Evid. 801(c), 802. Evidence is admissible notwithstanding the hearsay rule, however, if it is '[a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan).'" *Penley*, 2023 ME 7, ¶ 15, 288 A.3d 1183 (quoting M.R. Evid. 803(3)[1]). "The state of mind hearsay exception is limited to evidence that is highly relevant and uttered in circumstances indicating its truthfulness above and beyond the reliability presumed of all statements of present mental state." *Id.* (alterations and quotation marks omitted).

[¶25]  When the State offers evidence of a victim's state of mind in a murder case, the evidence is generally inadmissible because both the murder

---

[1] The pertinent portion of Rule 803 of the Maine Rules of Evidence provides,

**RULE 803.  EXCEPTIONS TO THE RULE AGAINST HEARSAY—REGARDLESS OF WHETHER THE DECLARANT IS AVAILABLE AS A WITNESS**

The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:

. . . .

**(3)     Then-existing mental, emotional, or physical condition.**  A statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will.

statute and the statute governing self-defense are focused on the *defendant's*

state of mind, and because the victim's state of mind is generally not relevant

to any element of a crime or defense. *See id.* ¶¶ 17-18.

[¶26]  The considerations are different, however, when the *defendant*

offers the evidence.  There are two purposes for which a defendant charged with

an assault or other act of physical violence can offer evidence of threats made by

the victim against the defendant. *See* 17-A M.R.S. § 108 (1), (2) (2024); M.R. Evid.

803(3).  One such purpose is to show, for purposes of establishing the

self-defense justification, that the victim's prior threats placed the defendant in

reasonable fear that the victim was about to use deadly force.  *See* 17-A M.R.S.

§ 108(1), (2)(A)(1).  The other purpose is to show the victim's intent or plan to

carry out the threat.  *See* M.R. Evid. 803(3).  We discussed the differences

between the two in *State v. Mitchell*:

> Where self defense is invoked by a defendant, threats of violence
> made against him by the person hurt or killed by him are generally
> admissible, *when known to the defendant before the act*, as evidence
> of his apprehension for his own safety, and the reasonableness of
> that apprehension.
>
> . . . . It is permissible, however, under some circumstances, to
> prove that a person on whom an assault is alleged to have been
> committed had made threats against the person charged with the
> assault.  *The issue in such a case is not whether the respondent knew
> of them,* but whether in fact the threats had been made.  The reason
> for the admission of evidence of such threats . . . is that [a] threat is

a declaration of purpose, and like other declarations of purpose is evidence that an occurrence that might be in execution of that purpose was in fact in execution thereof.

144 Me. 320, 323-25, 68 A.2d 387, 388-89 (1949) (emphasis added and quotation marks omitted).[2]

[¶27]   Given the evidence in this case, the court did not abuse its discretion in informing the jury that the messages between Johnson and Trudeau did not "go to the issue of self-defense."  There was no evidence that Ketcham was aware of the exchanges before he shot Johnson and maimed Trudeau, so they could not have caused Ketcham to believe that Johnson or Trudeau was about to use force or deadly force against him.  Even if Johnson did convey the threats he discussed with Trudeau to Ketcham during his argument on the phone with Ketcham, there is no evidence that Johnson or Trudeau brought the bat described in the messages they exchanged, or any other weapon, with them when they met Ketcham.  Because the identity of the initial aggressor was not in issue on this record, there was no abuse of

---

[2] Courts in other states have held that evidence of a victim's animosity or intentions toward the defendant may be admissible to show "who started the fight" when the evidence conflicts on that question, *Massey v. State*, 525 S.E.2d 694, 695 (Ga. 2000); *Jenkins v. State*, 422 So. 2d 1007, 1008 (Fla. Dist. Ct. App. 1982), *vacated in part on other grounds*, 444 So. 2d 947 (Fla. 1984), or "to corroborate evidence of threats which in fact were communicated," *Massey*, 525 S.E.2d at 695; *Dixon v. State*, 352 S.E.2d 572, 574 (Ga. 1987).

16

discretion in the court's limitation on the purposes for which the jury could consider the messages.[3]

### 2.    Refusal to Supply the Jury with an Unadmitted Printout of the Messages

[¶28]  Although Ketcham never offered, and the court never admitted, a copy of the messages exchanged between Johnson and Trudeau, Ketcham argues that the court should have delivered a copy to the jury upon the jury's request because the contents of the messages had been admitted through testimony for proper purposes.

[¶29]  "Whether an *admitted* piece of evidence accompanies the jury into the jury room during its deliberations is a matter within the trial court's discretion." *State v. Corbin*, 2000 ME 167, ¶ 6, 759 A.2d 727 (emphasis added). Here, the printout of the messages was not authenticated, offered, or admitted, although some of the contents were admitted through Ketcham's cross-examination of Trudeau.  As in *State v. Preston*, 581 A.2d 404, 408

---

[3]  Even were we persuaded that it was an abuse of discretion to limit the jury's consideration of the evidence, any error was harmless given the lack of evidence that either victim possessed a deadly weapon or otherwise threatened or exerted deadly force when they met with Ketcham. M.R.U. Crim. P. 52(a); *see Dixon*, 352 S.E.2d at 574 (affirming a judgment of conviction when the error in excluding evidence of the victim's words was "harmless beyond a reasonable doubt due to the overwhelming evidence of guilt, including the evidence that the defendant purchased and hid the gun shortly before he shot the victim and the evidence that the victim was a small woman, was shot from a point higher than herself, and was highly intoxicated at the time she was shot by the defendant, and therefore unlikely to present a physical threat to him").

(Me. 1990), where the court refused to allow a diary to enter the jury deliberation room when only certain relevant passages had been read to the jury for impeachment purposes, the court here did not abuse its discretion. The court properly withheld from the jury deliberation room documents that contained at least some information that had not been admitted at trial. *See id.*

## B.    Mid-Trial Question of Competency

[¶30] Ketcham argues that, despite his counsel's reassurances to the trial court that Ketcham understood what was happening at trial, the court should have ordered a competency evaluation given the court's own observation that Ketcham appeared medicated and exhibited a flat affect. He argues that the court's failure to order an evaluation affected his substantial rights because he thereafter made the decision whether to testify[4]—a decision he could make effectively only if he was competent.

[¶31]  "The initial responsibility of raising the question of possible incompetence to stand trial is on [a defendant's] counsel, but if the trial court learns from observation, reasonable claim or credible source that there is a genuine doubt of the accused's competency, it becomes the duty of the trial court to order an inquiry concerning his competence to stand trial." *State v.*

---

4 Ketcham decided not to testify.

18

*Hewett*, 538 A.2d 268, 269 (Me. 1988) (citation omitted). "A trial court's decision not to inquire into an accused's competency is disturbed only for arbitrary action or abuse of discretion." *Id.*

[¶32]  Here, the court undertook the required inquiry into Ketcham's competence to stand trial and did not act arbitrarily or abuse its discretion by relying on Ketcham's counsel, who had noticed Ketcham's "different" demeanor and spoken with Ketcham to confirm that he understood the proceedings. Although the court could have ordered a competency evaluation on its own initiative, it was not required to do so, particularly when counsel had indicated that such a measure was unnecessary. *See* 15 M.R.S. § 101-D(1) (2024) ("The court *may* for cause shown order that the defendant be examined to evaluate the defendant's competency to proceed as provided in this subsection." (emphasis added)).

## C.    Sentence Appeal

[¶33]  Ketcham argues that the court misapplied sentencing principles and that, when viewed in their overall effect, the sentences offend prevailing notions of decency and constitute a de facto life sentence for a person who was only twenty-one years old at the time of the crime, amounting to a violation of article I, section 9 of the Maine Constitution.

### 1. Application of Sentencing Principles

[¶34]   Courts apply a two-step process for murder sentencing and employ an additional third step in sentencing for crimes other than murder. *See* 17-A M.R.S. § 1602(1), (2) (2024).  "First, the court shall determine a basic term of imprisonment by considering the particular nature and seriousness of the offense as committed by the individual."  *Id.* § 1602(1)(A).  "Second, the court shall determine the maximum term of imprisonment to be imposed by considering all other relevant sentencing factors, both aggravating and mitigating, appropriate to the case," which may include "the character of the individual, the individual's criminal history, the effect of the offense on the victim and the protection of the public interest."  *Id.* § 1602(1)(B).  Third, for convictions of crimes other than murder, "the court shall determine what portion, if any, of the maximum term of imprisonment under paragraph B should be suspended and, if a suspension order is to be entered, determine the appropriate period of probation or administrative release to accompany that suspension."  *Id.* § 1602(1)(C).

[¶35]   We review a sentencing court's determination of the basic sentence at step one for misapplication of the law or of sentencing principles, or an abuse of the court's sentencing power. *See State v. Williams*, 2020 ME 128,

¶ 56, 241 A.3d 835.  We review the determination of the maximum sentence at step two for an abuse of discretion and the final sentence reached by the court for a disregard of sentencing factors or an abuse of the court's sentencing power. *Id.*  We review whether the court, at "each of the steps of the sentencing process," has "articulate[d] which sentencing goals are served by the sentence." *State v. Watson*, 2024 ME 24, ¶ 22, 319 A.3d 430 (quotation marks omitted). "Because it can be challenging in a given case to reconcile potentially disparate sentencing goals, the trial court is generally afforded significant leeway in determining which factors are considered and the weight a factor is assigned." *Id.* (quotation marks omitted).  Although "a sentencing court is not required to consider or discuss every argument or factor the defendant raises, it must still articulate which sentencing goals are served by the sentence and must not disregard significant and relevant sentencing factors." *Id.*

[¶36]  Although Ketcham disagrees with the court's weighing of the social-science research regarding some young men's brain development, the court explicitly considered, as mitigating factors, Ketcham's young age and the current social science regarding brain development after age eighteen in some young men.  Similarly, although Ketcham contends that the court should have afforded him rehabilitative opportunities, it did do so—at the pertinent final

stage of sentencing for the attempted murder count—by considering both Ketcham's need for supervision before living independently in the community and the importance of having ten additional years of potential incarceration as a deterrent to motivate Ketcham to succeed when he leaves prison. Ketcham does not, in any other respects, challenge the propriety of the sentence, and there has been no misapplication of sentencing principles or abuse of discretion as to any of the crimes for which Ketcham was convicted.

### 2. Illegal Imposition of a De Facto Life Sentence

[¶37]  "The Maine Constitution requires that 'all penalties and punishments shall be proportioned to the offense.'" *State v. Stanislaw*, 2013 ME 43, ¶ 28, 65 A.3d 1242 (quoting Me. Const. art. I, § 9). Maine "conduct[s] a proportionality review that is broader than the proportionality review that derives from the Eighth Amendment's prohibition against cruel and unusual punishment." *Id.* (citing sources).

[¶38] We have adopted a two-part test for assessing proportionality. *Id.* ¶ 29. First, we "compare the gravity of the offense with the severity of the sentence." *Id.* (alteration and quotation marks omitted). Second, if that comparison creates "an inference of gross disproportionality," we "compare the

defendant's sentence with the sentences received by other offenders in the same jurisdiction." *Id.* (quotation marks omitted).

[¶39]   In comparing the gravity of the offense with the severity of the punishment, we consider the purposes of sentencing. *See id.* ¶ 30.  The trial court considered the statutory purposes in effect at the time and concluded that the factors italicized below were particularly relevant:

> **1. Prevent crime.**  *Prevent crime through the deterrent effect of sentences, the rehabilitation of persons and the restraint of individuals when required in the interest of public safety*;
>
> **2. Encourage restitution.**  Encourage restitution in all cases in which the victim can be compensated and other purposes of sentencing can be appropriately served;
>
> **3. Minimize correctional experiences.**   Minimize correctional experiences that serve to promote further criminality;
>
> **4. Provide notice of nature of sentences that may be imposed.**  Give fair warning of the nature of the sentences that may be imposed on the conviction of a crime;
>
> **5. Eliminate inequalities in sentences.**   Eliminate inequalities in sentences that are unrelated to legitimate criminological goals;
>
> **6. Encourage just individualization of sentences.**  Encourage differentiation among persons with a view to a just individualization of sentences;
>
> **7. Elicit cooperation of individuals through correctional programs.**  Promote the development of correctional programs that elicit the cooperation of convicted individuals;

***8. Permit sentences based on factors of crime committed.***
*Permit sentences that do not diminish the gravity of offenses, with reference to the factors, among others*, of:

**A.** The age of the victim, particularly of a victim of an advanced age or of a young age who has a reduced ability to self-protect or who suffers more significant harm due to age;

**B.** The selection by the person of the victim or of the property that was damaged or otherwise affected by the crime because of the race, color, religion, sex, ancestry, national origin, physical or mental disability, sexual orientation, gender identity or homelessness of the victim or of the owner or occupant of that property; and

**C.** The discriminatory motive of the person in making a false public alarm or report in violation of section 509, subsection 1; and

**9. Recognize domestic violence and certified domestic violence intervention programs.** Recognize domestic violence as a serious crime against the individual and society and to recognize domestic violence intervention programs certified pursuant to Title 19-A, section 4116 as the most appropriate and effective community intervention in cases involving domestic violence.

17-A M.R.S. § 1501 (2023) (emphasis added).[5]

[¶40]    Here, none of the sentences, taken in isolation, is grossly disproportionate to the crimes committed.  A forty-five-year sentence for the execution-style shooting death of a young person over a seemingly trivial

---

[5]  This statute has since been amended, though not in a way that is relevant to the sentencing considerations at issue in this appeal.  *See* P.L. 2023, ch. 430, § 2 (effective Oct. 25, 2023) (codified at 17-A M.R.S. § 1501(8)(C) (2024)).

argument is not grossly disproportionate. Nor is a thirty-year sentence grossly disproportionate in relation to the nature of the attempted murder, which resulted in gruesome, life-threatening, and permanently debilitating injuries and was committed with the intent to eliminate a witness to a murder. As Ketcham acknowledges, the fifteen-year concurrent sentence for elevated aggravated assault did not add to the unsuspended period of incarceration. Thus, no "inference of gross disproportionality" may be drawn from any of the sentences, viewed independently. *Stanislaw*, 2013 ME 43, ¶ 29, 65 A.3d 1242 (quotation marks omitted).

[¶41] The length of the combined sentences results primarily from the imposition of *consecutive* sentences. Ketcham does not contend that the court erred in determining that consecutive sentences should be imposed, however, and the facts amply support the court's decision to impose consecutive sentences. *See* 17-A M.R.S. § 1608(1)(A) (2024) ("[T]he court may impose the sentences consecutively after considering" that "[t]he convictions are for offenses based on different conduct or arising from different criminal episodes."); *State v. Hofland*, 2012 ME 129, ¶¶ 3, 9, 27, 58 A.3d 1023 (affirming consecutive sentencing for the defendant's criminal conduct in a school gymnasium and his subsequent conduct that day in a school classroom). In

sum, the consecutive sentences are not grossly disproportionate in relation to the nature and gravity of the crimes committed, and the inquiry ends at this first step of the proportionality analysis.[6]

The entry is:

Judgment and sentence affirmed.

---

Michelle R. King, Esq. (orally), Thistle Weaver & Morris, Portland, for appellant Dylan Ketcham

Aaron M. Frey, Attorney General, and Leanne Robbin, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee State of Maine

Kennebec County Unified Criminal Docket docket number CR-2020-124
For Clerk Reference Only

---

[6] To the extent that the imposition of a lengthy sentence upon a young adult for conduct committed on a single night may seem contrary to sound public policy—rather than as a matter of constitutional law, which must be our focus—the Legislature may consider whether to impose statutory limitations on such sentences.